**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Hozie CHAMBERLIN,**
**Defendant-Appellant.**

**No. 79–1076.**

United States Court of Appeals,
Ninth Circuit.

Dec. 26, 1979.

---

Judy C. Clarke, San Diego, Cal., for defendant-appellant.

David C. Doyle, Asst. U. S. Atty. (on the brief), Michael H. Walsh, U. S. Atty., David C. Doyle, Asst. U. S. Atty. (argued), San Diego, Cal., for plaintiff-appellee.

Before CHOY, ANDERSON and HUG, Circuit Judges.

HUG, Circuit Judge:

Hozie Chamberlin appeals from a conviction of possession of a check stolen from the mail in violation of 18 U.S.C. § 1708. The principal question on this appeal is whether the detention of the appellant following an investigatory stop resulted in a seizure amounting to an unlawful arrest requiring suppression of the evidence derived from that detention. The appellant moved to suppress the evidence and upon denial of the motion, he waived a jury trial and proceeded to trial before the court on stipulated facts. We find that the detention was unlawful and the motion to suppress should have been granted; we therefore reverse.

The issues involved are: (1) whether the investigatory stop of Chamberlin by the Officer was justified by founded suspicion; (2) whether the subsequent detention amounted to unlawful arrest without probable cause; and (3) whether subsequent evidence obtained was the fruit of an unlawful arrest.

### Facts

On October 4, 1978 at about 12:20 P.M. Officer Morse of the San Diego Police Department, while driving on routine patrol, observed appellant, Hozie Chamberlin, and a companion, Robert Franklin, walking away from the Chicano Park area in southeast San Diego. Officer Morse recognized Chamberlin and Franklin as individuals with extensive criminal records for narcotics violations, receipt of stolen property, forgery and burglary. Officer Morse was suspicious that criminal activity was afoot because they looked worried as he passed and quickened their pace. He drove back by the area about a minute later. Robert Franklin then darted between two houses, looked back out between the houses at the officer and began running away. Appellant Chamberlin also attempted to flee but was hampered from running because of a physical handicap.

Officer Morse caught up with Chamberlin and asked him what he was doing. Chamberlin replied that he was returning from paying his mother's furniture bill at the Universal Furniture Store. Officer Morse then asked why Robert had run away. Chamberlin replied, "I don't know any Robert." This increased Officer Morse's suspicions because he knew that Chamberlin and Robert Franklin were well acquainted.

At this point Officer Morse required appellant Chamberlin to get in the back of the patrol car so he could continue his search for Robert Franklin. It was Officer Morse's intention to detain Chamberlin for further investigation while he attempted to find Franklin.

Officer Morse proceeded to Franklin's residence and began working back towards the area from which Franklin and Chamberlin had fled. Five minutes after Chamberlin's detention began, Officer Morse received a radio call informing him that a check had been found lying near the point where Chamberlin and Franklin had been when they had begun to flee. He then went back to the area and obtained the check, which was a United States Treasury check bearing the name "Willie Johnson" as payee.

When Officer Morse returned to his patrol car with the check, Chamberlin became

nervous and began to sweat. Officer Morse then reinquired as to Chamberlin's statement regarding paying his mother's furniture bill at the Universal Furniture Store. Chamberlin denied that he made any statement about having been at the Universal Furniture Store and explained that his mother lived on University Avenue and that this was possibly what the Officer heard him say. At this point, Officer Morse decided to go to the Universal Furniture Store to investigate the matter further.

He drove to the store with Chamberlin still in the back of the patrol car. At the store the manager and the employees informed Officer Morse that they knew Hozie Chamberlin and that he had been in the store an hour earlier attempting to negotiate a check. Officer Morse showed them the check bearing the name "Willie Johnson" as payee and they identified it as the check Chamberlin had earlier tried to cash. Officer Morse then placed Chamberlin under arrest. Chamberlin had been detained in the rear of the patrol car for twenty minutes from the time he was first picked up.

Chamberlin was indicted for possession of a check stolen from the mail. 18 U.S.C. § 1708. Chamberlin contended that the stop and arrest were unlawful and moved to suppress all statements and evidence obtained as a result of the stop and arrest. The motion was followed by a hearing at which Officer Morse and other witnesses testified. The district court noted that this was a close case and denied the motion, holding that the stop was lawful under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The district court relied largely upon the Sixth Circuit case of *United States v. Pope*, 561 F.2d 663 (6th Cir. 1977), in which the flight of the accused upon the approach of an Officer to question

him was a major factor in the court's determination that reasonable suspicion for the *Terry* stop existed. The district court in the instant case did not focus upon the question of the lawfulness of the detention in the patrol car subsequent to the investigatory stop and prior to the interview with the employees of the furniture store. It should be noted that the district court did not then have the benefit of the Supreme Court's recent ruling in *Dunaway v. New York*, —— U.S. ——, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), which bears heavily upon this question.

### Discussion

We first examine the two possible intrusions into rights protected by the Fourth and Fourteenth Amendments: the stop and the subsequent detention.

1. *The stop.* When Officer Morse first observed Chamberlin and Franklin, he knew that both men had criminal records. He also observed that when these two men noticed him, both men looked worried and quickened their pace. A minute later while watching the two men for the second time, Officer Morse observed Franklin go between two houses, look toward him, and begin to run. Chamberlin also attempted to flee. As the trial judge correctly noted, the flight of both men is a crucial fact which justified the investigatory stop. Under all these circumstances, Officer Morse was justified in making an investigatory stop of Chamberlin under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[1]

2. *The subsequent detention.* The detention in this case must be analyzed in light of the Supreme Court's recent decision of *Dunaway v. New York*, —— U.S. ——, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In

---

1. California law governing brief investigatory stops is the same as the federal law. *See In Re Tony C.*, 21 Cal.3d 888, 893–95, 148 Cal.Rptr. 366, 368–70, 582 P.2d 957, 959–61 (1978). The stop in this case was made by a state officer. We find that the investigatory stop was proper under both state and federal standards and thus need not reach the question which would be posed were the state standard more restrictive. *See United States v. Orozco*, 590 F.2d 789, 792 n. 1. (9th Cir. 1979); *United States v. Grajeda*, 587 F.2d 1017 (9th Cir. 1978).

*Dunaway*, Rochester Police suspected that the defendant had killed the proprietor of a pizza parlor in Rochester, N.Y., but did not have probable cause to get a warrant for his arrest. The police officers took the defendant from a neighbor's house, seated him in a police car, transported him to the police headquarters, and placed him in an interrogation room. Although the defendant was not told he was under arrest, he would have been physically restrained if he had attempted to leave. After giving the defendant his *Miranda* warnings, the officers questioned the defendant. Defendant waived counsel and eventually made statements and drew sketches that incriminated him in the crime.

The issue before the Supreme Court was whether the Rochester Police violated the Fourth and Fourteenth Amendments when, without probable cause to arrest, they took the defendant into custody, transported him to the police station, and detained him there for interrogation. The Court stated:

> The Fourth Amendment, applicable to the States through the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), provides: The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . . There can be little doubt that petitioner was 'seized' in the Fourth Amendment sense when he was taken involuntarily to the police station.

*Dunaway*, 99 S.Ct., at 2253. The Court then noted: "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Dunaway*, 99 S.Ct. at 2253, n. 6, quoting from *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The Court in *Dunaway* carefully analyzed the distinction between the seizure of a person for purposes of arrest, which requires probable cause, and the more limited seizure of a person by a brief investigatory stop, which requires merely reasonable suspicion, but normally consumes less than a minute or two and involves only a few brief questions. The Court rejected the suggestion of a multifactor balancing test of "reasonable police conduct under the circumstances." It emphasized that the *Terry* stop was a narrow exception and was not to be extended so as to erode the long prevailing standards of probable cause. The Court stated:

> A single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront. Indeed, our recognition of these dangers, and our consequent reluctance to depart from the proven protections afforded by the general rule, is reflected in the narrow limitations emphasized in the cases employing the balancing test. For all but those narrowly defined intrusions, the requisite "balancing" has been performed in centuries of precedent and is embodied in the principle that seizures are "reasonable" only if supported by probable cause.

*Dunaway*, 99 S.Ct. at 2257.

The Court stressed that a lesser standard than probable cause was not to be applied merely because the seizure occurred during an investigative stage rather than an accusatory stage. In quoting from *Davis v. Mississippi*, 394 U.S. 721, 726–27, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) the Court stated:

> "[T]o argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment. Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our

citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.' "

*Dunaway,* 99 S.Ct. 2257.

The *Terry* case involved a limited on-the-street stop and frisk for weapons. The Court in *Dunaway* traced the narrow application of the exception in subsequent cases. The Court pointed out in *Dunaway,* 99 S.Ct. at 2256–57 that *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), applied the *Terry* exception to roving border patrols stopping automobiles to check for illegal immigrants where the stop was for less than a minute and involved only a brief question or two. However, as the Court noted, *Brignoni-Ponce* refused to extend *Terry* to a generalized balancing test but had stated:

> "The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, *but any further detention or search must be based on consent or probable cause.*" *Brignoni-Ponce,* 422 U.S. at 881–882, 95 S.Ct. 2574. Accord, *United States v. Martinez-Fuerte, supra,* 428 U.S. 543, at 567, 96 S.Ct. 3074, at 3087, 49 L.Ed.2d 1116.

*Dunaway,* 99 S.Ct. at 2256–57.

The Court in *Dunaway* drew a firm line between the limited *Terry* stop, involving a very brief detention of a minute or so, and any more extensive detention. The longer detentions must be justified by the traditional requirement of probable cause. Probable cause exists where facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested. *Dunaway,* 99 S.Ct. at 2254 n. 9.

█ As we have noted, there were sufficiently specific articulable facts upon which to base a reasonable suspicion that criminal activity was afoot when Chamberlin was stopped. This would be sufficient to justify a brief stop and a few brief questions. However, there was not probable cause then or after the brief questioning to justify a more extensive detention. Chamberlin was held in the back of the patrol car for twenty minutes while the police officer attempted to locate Robert Franklin and continued his investigation. There is no doubt that this was reasonable, good faith police work on the part of the officer. He was obviously attempting to retain custody of Chamberlin until he could locate Franklin to question them both. The government argues that this detention was justified by the necessities of the circumstances and the good faith actions of the police officer. This, however, is the very balancing approach that the Supreme Court rejected in *Dunaway.* It is true that the fact situation in *Dunaway* constituted a more flagrant unlawful detention because the police without probable cause went out to pick up the accused rather than encountering him in suspicious circumstances, and not only placed him in the patrol car but took him to the police station. This case certainly constitutes a lesser intrusion on Chamberlin's liberty. However, this is a significantly greater intrusion than the brief *Terry* stop and the opinion in *Dunaway* makes it very clear that a 'seizure' of a person for other than the very brief investigatory stop involved in *Terry* and *Brignoni-Ponce* must be justified by probable cause.

Here, Chamberlin was not questioned briefly where he was found. He was placed in the back seat of a police car for twenty minutes. While in the police car, Officer Morse observed his demeanor and questioned him. He was never informed that he was free to leave the car. In fact, Officer Morse admitted that once he detained Chamberlin, he was not free to go. Officer Morse also admitted that he detained Chamberlin "to find out what was going on." Therefore, we conclude that the twenty minute detention of Chamberlin constituted a "detention for custodial interrogation" within the meaning of *Dunaway v.*

*New York.* We accordingly hold that this detention violated Chamberlin's Fourth and Fourteenth Amendment rights.[2]

■ The final question before this court is whether the statements made by Chamberlin to Officer Morse which connected him to the Universal Furniture Store and resulted in his being connected to the check and the identification of him made by the Universal Furniture Store employees are fruits of the poisonous tree under *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In *Wong Sun v. United States,* the Supreme Court stated that:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, *Evidence of Guilt,* 221 (1959).

*Id.* at 487–88, 83 S.Ct. at 417.

It is well-settled in this circuit that even if the controverted evidence could have been traced directly or indirectly from the leads turned up by the illegal activity, the evidence will nevertheless be admissible if in fact the Government learned of it from an independent source. *United States v. Bacall,* 443 F.2d 1050, 1056 (9th Cir.), *cert. denied* 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971). *See also: United States v. Cales,* 493 F.2d 1215, 1216 (9th Cir. 1974). Thus, the issue narrows to whether the primary illegality led to the discovery of the above noted statements and identification or whether it was obtained through independent means.

■ In order to determine whether the statements and identification are fruits of the poisonous tree, a brief review of the facts is necessary. When Officer Morse initially stopped Chamberlin, Officer Morse asked him two questions. Officer Morse asked Chamberlin what he was doing. Chamberlin responded that he had just returned from paying his mother's furniture bill at the Universal Furniture Store. Officer Morse also asked why Robert had run away. Chamberlin responded that he did not know any Robert. Neither of Chamberlin's statements was the product of illegal activity, and thus, the fruit of the poisonous tree doctrine is not applicable as to these statements. *See: United States v. Sand,* 541 F.2d 1370, 1375–76 (9th Cir. 1976), *cert. denied, sub nom. Scully v. United States,* 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 553 (1977). Both statements were made prior to placing Chamberlin in the police car while Officer Morse was still engaging in a *Terry* investigatory stop.[3] As discussed above, the investigatory stop was justified under the circumstances.

Five minutes after placing Chamberlin in the police car, Officer Morse received a radio message that a check had been found near the point of Chamberlin's apprehension. After retrieving the check, Officer Morse observed Chamberlin's nervous demeanor. Officer Morse then reinquired as to Chamberlin's statement regarding paying his mother's furniture bill at the Universal Furniture Store. Chamberlin responded by disclaiming that he had made

---

**2.** Since we find the detention violative of the federal Constitution, we need not reach the propriety under state law of the detention. *See United States v. Thompson,* 597 F.2d 187, 190 n. 6 (9th Cir. 1979).

**3.** For purposes of this analysis we shall take the facts as found by the district judge at the suppression hearing. The district judge found that the initial statement by Chamberlin about the furniture store was before he was placed in the patrol car. However, the stipulated facts presented at trial indicate that the initial statement by Chamberlin that he had just been to the furniture store was after he had been placed in the patrol car.

such a statement. Both Officer Morse's observation as to Chamberlin's nervous demeanor and Chamberlin's disclaimer are fruits of the poisonous tree. Both the observation and the disclaimer were products of the unlawful detention of Chamberlin. *See: United States v. Sand, supra* at 1375–76.

It was only after Officer Morse observed Chamberlin's nervous demeanor and Chamberlin had made the disclaimer that Officer Morse decided to go to the Universal Furniture Store. After arrival at the store, the employees identified the check as being the same check that Chamberlin had tried to cash earlier. Thus, whether the identification is fruit of the poisonous tree hinges on whether it was discovered as a result of the illegal detention or from sources independent of the illegal detention. The information available to Officer Morse which was obtained independent from the illegal detention can be summarized as follows: Officer Morse observed Chamberlin acting suspiciously. Chamberlin had attempted to flee while Officer Morse was observing him for a second time. Chamberlin stated that he had just come from paying his mother's bill at the Universal Furniture Store. A check was subsequently found near the location of Chamberlin's attempted flight. The information available to Officer Morse which was obtained as a direct result of the illegal detention can be summarized as follows: After retrieving the check, Chamberlin appeared nervous. Chamberlin also disclaimed that he had made the statement about having been at the Universal Furniture Store.

 The test in this circuit is not whether a "but for" relationship exists between the illegal activity and later investigation but whether its fruits "tended to significantly direct" that investigation to the evidence in question. *United States v. Cales,* 493 F.2d 1215, 1215–16 (9th Cir. 1974); *United States v. Brandon,* 467 F.2d 1008, 1010 (9th Cir. 1972); *United States v. Bacall,* 443 F.2d 1050, 1057 (9th Cir. 1971).

Here, the fruits of the illegal activity were Officer Morse's observation and Chamberlin's disclaimer. These fruits obviously "tended to significantly direct" Officer Morse to the Universal Furniture Store where the identification evidence was obtained. Thus, the identification evidence is fruit of the poisonous tree. We conclude that Officer Morse's observation as to Chamberlin's nervous demeanor, Chamberlin's disclaimer that he did not make the statement about having been at the Universal Furniture Store, and the identification made by the Universal Furniture Store employees are fruits of the poisonous tree and should have been suppressed.

Reversed and remanded.

CHOY, Circuit Judge, concurring and dissenting:

Because of the Supreme Court's strongly-couched dicta in *Dunaway v. New York,* —— U.S. ——, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), I agree with my colleagues that the detention of Chamberlin after the initial investigatory stop was illegal.

However, I respectfully dissent from my colleagues' conclusion that all the evidence derived by the officer after the placement of Chamberlin in the back seat of the police car was tainted by the illegal detention and therefore must be suppressed as the fruit of a poisonous tree.

My colleagues find that the officer's initial observation of Chamberlin's suspicious behavior, Chamberlin's first statement about the Universal Furniture Store, and his statement regarding Franklin were completely untainted. All this evidence was obtained before the illegal detention.

But I wish to point out that the officer's receipt of the radio message and his discovery that the check belonged to a third person, rather than to Chamberlin's mother, were also untainted, because they had no connection with the illegal detention. The information in the officer's possession at that moment made him suspicious of Cham-

berlin's earlier reference to the furniture store. Even if Chamberlin had been released before, the officer would have proceeded directly to the furniture store, where he would have obtained (without any hint of illegality) the evidence that was used to convict Chamberlin.

Since in fact the officer had Chamberlin in detention when the properly discovered facts pointed him toward the furniture store, he engaged him in further dialogue about the furniture store and observed his nervousness and sweating. This evidence was the fruit of the illegal detention; however, it was not the source of the evidence obtained at the furniture store. The illegally-obtained evidence merely buttressed a determination, based on undeniably legal evidence, that the officer had already made.

When reviewing refusals to suppress evidence, we view the facts in the light most favorable to the Government's position. *E. g., United States v. Sherman*, 430 F.2d 1402, 1404 (9th Cir. 1970), *cert. denied*, 401 U.S. 908, 91 S.Ct. 865, 27 L.Ed.2d 805 (1971). I believe that the facts that emerge under such a view compel a result different from that which my colleagues have reached. *See United States v. Brandon*, 467 F.2d 1008, 1010–11 (9th Cir. 1972).

I would affirm the conviction.