**UNITED STATES of America**

v.

**CANTO, Rios, Hernando Herrera, Humberto (Alvaro) Herrera, Defendants.**

**No. 79 CR 412.**

United States District Court,
E. D. New York.

Feb. 29, 1980.

Harvey Golubock, Asst. U. S. Atty., Brooklyn, N. Y., for United States.

Ira Leitel, New York City, for Prudencio Canto.

Edward Panzer, New York City, for Jorge Rios.

Hal Meyerson, New York City, for Hernando Herrera.

Hyman Mendelson, Brooklyn, N. Y., for Humberto Herrera.

## MEMORANDUM OF DECISION AND ORDER

COSTANTINO, District Judge.

Defendants, Prudencio Canto, Jorge Rios, Humberto Herrera ("Alvaro") and Hernando Herrera, are charged with violating the federal narcotics laws.[1] After reviewing the papers submitted and after reading the transcripts of the testimony given in court during the months of October, November, and December, the court finds that it must deny defendants' motions to suppress various statements, identifications, and physical evidence obtained as a result of arrests and searches. Because of conflicting schedules and illnesses on the part of the attorneys, the court was unsuccessful in its earlier attempt to render this decision orally. The court will now present its findings of fact and examine defendants' contentions *seriatim*.

*The Arrest of Alvaro*

William Frawley, a Detective with the Drug Enforcement Task Force, testified as to the events leading up to the arrests of Alvaro, Canto, Rios and Hernando. The

---

1. The indictment charges violations of 21 U.S.C. §§ 841(a)(1), 846.

court finds that such testimony was fully credible and consistent with the evidence developed in court. Concerning Alvaro, the facts indicate that Frawley, at the very least, had reasonable suspicion to stop the defendant.

Two reliable informants of the Drug Enforcement Administration ("DEA") independently had alerted narcotics agents that defendants Canto and Rios were members of a Columbian narcotics ring operating in Queens, New York. The informants previously had dealt with defendants, Canto and Rios. Surveillance began of Canto's residence at 2524 32nd Street in Queens. More than one week before the arrests, Frawley, with the assistance of other agents, had the opportunity to observe Canto and Rios, and the Monte Carlo driven by the defendants. On July 2, 1979, Frawley followed the red Monte Carlo to 46th Street between 30th Avenue and 30th Road ("the park"). There he saw three males speak with Canto and Rios. Frawley later was able to identify one of these three males as Alvaro.

On July 10, 1979 Frawley conducted a surveillance of the park. He observed Alvaro in the company of an unknown male, Green Shirt. Frawley watched Alvaro for 45 minutes with the use of binoculars. He witnessed several males hand Alvaro money and depart with an unidentified item.[1a] Frawley then observed Rios join Alvaro and Green Shirt. A conversation ensued. Shortly thereafter, the 1974 Monte Carlo stopped adjacent to Rios, Alvaro and Green Shirt. The four men talked. At this point, Frawley was positioned so as to view the occupants of the Monte Carlo. He saw Canto and another male, later identified as Hernando.

Frawley maintained surveillance of Canto, Hernando, Rios, Alvaro and Green Shirt. He observed Canto and Hernando exit from the car and approach the other three males. A conversation followed. Frawley watched as Canto and Hernando returned to the Monte Carlo, drove a short distance and examined something on the seat of the car. Hernando then drove back to the same location where Rios, Alvaro and Green Shirt had been standing.

Alvaro and Green Shirt, who were both empty-handed, walked over to Canto and then emerged with a brown plastic bag. The Monte Carlo departed. Alvaro, Rios, and Green Shirt proceeded along 45th Street. Frawley, having the benefit of previous surveillance of Alvaro, determined that Alvaro would return to his 4512 30th Avenue residence. Alvaro and Green Shirt proceeded in the direction of 4512 30th Avenue. Green Shirt, upon noticing Frawley, abruptly turned the corner back onto 45th Street.

Frawley walked up to Alvaro, showed his badge and identified himself as a police officer. No gun was drawn. Alvaro dropped the unsealed brown plastic bag. As Frawley leaned over to pick it up, he was able to see that the bag contained a white powdered substance. During the process of retrieving the bag, Frawley placed his gun against the side of his leg. Frawley then handcuffed Alvaro and placed the defendant in the back seat of the agent's car. After an unsuccessful attempt to find Green Shirt, Frawley returned to 4512 30th Avenue, whereupon he placed Alvaro in the custody of other officers.

Given the underlying circumstances, namely, the use of independent information from two reliable informants, the continued surveillance of the defendants which tended to corroborate the informants' information, probable cause to arrest Alvaro existed. *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *United States v. Jackson*, 544 F.2d 407 (9th Cir. 1976); *United States v. Canieso*, 470 F.2d 1224 (2d Cir. 1972); *United States v. Comissiong*, 429

---

**1a.** Frawley had previously received reliable information that drug transactions frequently took place in the park. Moreover, based upon his extensive experience in narcotics law enforcement and his observations, he concluded that these individuals were obtaining narcotics from Alvaro and Green Shirt. The court finds Frawley's conclusions to be reasonable under the circumstances.

F.2d 834 (2d Cir. 1970); *United States v. Llanes*, 398 F.2d 880 (2d Cir. 1968). Even assuming that probable cause did not exist at the moment Frawley approached Alvaro, specific and articulable facts existed to warrant a stop of the defendant. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See also United States v. Oates*, 560 F.2d 45 (2d Cir. 1977); *United States v. Magda*, 547 F.2d 756 (2d Cir. 1976); *United States v. Worthington*, 544 F.2d 1275 (5th Cir. 1977); *United States v. Westerbann-Martinez*, 435 F.Supp. 690 (E.D.N.Y.1977). The existence of probable cause to arrest Alvaro then developed during the course of the stop. *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977); *United States v. Walling*, 486 F.2d 229 (9th Cir. 1973), *cert. denied*, 415 U.S. 923, 94 S.Ct. 1427, 39 L.Ed.2d 479 (1974). Here, Frawley approached Alvaro and the defendant then dropped the plastic bag. The bag was unsealed. As Frawley leaned over, he was able to see a white powdered substance. In light of the information Frawley had before him, the observation of a bag containing white powder entitled the agent thereafter to make an arrest.[2] The bag, which was in plain view of an officer rightfully having that view, is subject to seizure and may be introduced into evidence. *United States v. Worthington*, 544 F.2d 1275 (5th Cir. 1977); *United States v. Santana*, 485 F.2d 365 (2d Cir. 1973); *United States v. Riggs*, 474 F.2d 699 (2d Cir. 1973).

*The Stop of the Monte Carlo*

The testimony elicited in court indicates that Task Force members knew of the continued search for a particular Monte Carlo and were aware of the general description of two males and the detailed description of two other males who were involved in criminal activity on July 10, 1979. Eventually, agents did locate the Monte Carlo. The agents drove past the car and saw its occu-

pants. Soon after, the car became mobile. The agents followed the Monte Carlo and then stopped the car. The police identified themselves. Instructions were given in Spanish for the three occupants to exit the vehicle. The agents were able to recognize Canto and Rios. The trunk was opened and bags of money were removed. The Monte Carlo, Canto and Rios were transported to DEA headquarters. Frawley was contacted so as to identify the third male. Shortly thereafter, Frawley arrived at the location where the Monte Carlo was stopped. He recognized the third male, Hernando, as the man he had seen driving the Monte Carlo. The defendants now contend that the stop, search and seizure of the Monte Carlo, the detention of Hernando, the identifications and eventual arrest of Canto, Rios and Hernando constituted unconstitutional police conduct.

DEA agents had probable cause to believe that the red Monte Carlo had been used for carrying cocaine and they properly seized the vehicle pursuant to the federal forfeiture statute. 21 U.S.C. § 881(a). *See also United States v. Johnson*, 572 F.2d 227 (9th Cir. 1978). Once the vehicle was validly seized for forfeiture, the subsequent search of the trunk was lawful, notwithstanding the fact that the search did not occur after the vehicle was impounded or pursuant to standard inventory procedure. *United States v. Panebianco*, 543 F.2d 447 (2d Cir. 1976); *United States v. Zaicek*, 519 F.2d 412 (2d Cir. 1975); *United States v. Karp*, 508 F.2d 1122 (9th Cir. 1974), *cert. denied*, 422 U.S. 1007, 95 S.Ct. 2628, 45 L.Ed.2d 669 (1975); *United States v. McCormick*, 502 F.2d 281 (9th Cir. 1974).

In light of the fact that Frawley had described the remaining defendants to fellow Task Force members who were aware that Canto and the red Monte Carlo had been involved in a drug transaction, it is evident that probable cause existed to arrest Canto and Rios.[3] *Beck v. Ohio*, 379

---

**2.** The detention of Alvaro in Frawley's car did not constitute illegal conduct and did not produce any statements by defendant.

**3.** Further, Agent Palumbo and Detective Werdann recognized that one of the occupants of

U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *United States v. Jackson,* 544 F.2d 407 (9th Cir. 1976); *United States v. Diggs, Keys, Floyd,* 522 F.2d 1310 (D.Col.1975); *United States v. Comissiong,* 429 F.2d 834 (2d Cir. 1970). The government further argues that since an automobile was involved which had been used and possibly was still being used for an illegal purpose, the agents were entitled to search it on the spot for additional drugs and weapons. Generally, if probable cause exists, an automobile may be searched without a warrant. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). However, the warrantless search of personal luggage or sealed parcels found in a vehicle is unconstitutional where there is no lessening of the complainant's expectation of privacy. *Arkansas v. Kansas,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *United States v. Dien, Gendler, Dakota,* 2d Cir., 609 F.2d 38 (1979).

■ Here, the agents were entitled to search the Monte Carlo, including the trunk. *Chambers v. Maconey,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *United States v. Ochs,* 595 F.2d 1247 (2d Cir. 1979). There was no search of personal luggage, rather there was found unsealed paper bags containing money. Accordingly, the seizure of the money was appropriate.

■ Palumbo and Werdann recognized Canto and Rios as the men described by Frawley and the confidential informants. There was apparently a question as to Hernando's complicity in the drug transactions of July 10, 1979. While an agent need not know the identity of the person in order to have probable cause to arrest, he must know enough to support a prudent man's belief that an offense is being or has been committed by the person whom he is arresting. *United States v. Llanes,* 398 F.2d 880 (2d Cir. 1968). Here, the agents reasonably suspected that Hernando was the third male described by Frawley. Under the circumstances presented to the court, the on-site detention of Hernando was proper.[4] *Terry v. Ohio,* 390 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ Defendants Canto, Rios and Hernando argue that Frawley's identifications must be suppressed as fruits of the poisonous tree. Whether the identification is fruit of the poisonous tree hinges on whether it was discovered as a result of the illegal detention or from sources independent of the illegal detention. *United States v. Chamberlain,* 609 F.2d 1318 (9th Cir. 1979). Here, there was no illegal arrest or detention. Even assuming that the arrests and detention of defendants were improper, it does not follow that the identification before and during trial by Frawley must be excluded. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *United States ex rel. Pella v. Reid,* 527 F.2d 380 (2d Cir. 1975); *United States v. Young,* 512 F.2d 321 (4th Cir. 1975); *United States ex rel. Phipps v. Follette,* 428 F.2d 912 (2d Cir.), *cert. denied,* 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970). Here, Frawley's ability to identify the defendants was based upon personal observations and not upon the allegedly illegal seizures of the defendants. Those identifications were reliable, given the surveillance by Frawley, often done with the use of binoculars. Further, the fruits of the alleged illegal activity did not tend to direct the agents to Frawley, where the identification evidence was obtained. Thus, the identification evidence is not fruit of the poisonous tree. *See generally United States ex rel. Hines v. LaVallee,* 521 F.2d 1109 (2d Cir. 1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976); *United States v. Hoffman,* 385 F.2d 501 (7th Cir. 1967).

---

the car was Rios even before Frawley arrived. It was also known that Rios was an associate of Canto's in narcotics trafficking.

4. The detention as presented to this court does not amount to an unconstitutional *Dunaway* seizure. *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

Defendants further argue that Frawley's observations of them after their arrests amount to improper show ups which must be excluded from evidence. For purposes of a defendant's due process rights the confrontation procedures must not be so unnecessarily suggestive and conducive to irreparable mistaken identification so as to operate as a denial of such rights. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The reliability of an identification must be examined in light of the facts and the totality of circumstances of each case despite the presence of suggestive procedures. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). This court has considered Frawley's opportunity to view the defendants, his degree of attention, the accuracy of his descriptions of the defendants, his degree of certainty concerning the identity of the defendants, and the time between the crime and the confrontation. The court is satisfied that the pre-trial identifications of Hernando, Rios and Canto were not impermissibly suggestive and did not give rise to the likelihood of irreparable misidentification.

### The Consent to Search

Immigration Officer Rita testified as to the events leading up to the signing of the Consent to Search Forms by defendants Canto, Hernando and Alvaro. The court finds that such testimony was fully credible and consistent with the evidence developed in court.

Rita testified that he was contacted by the DEA to interview individuals who were suspected illegal aliens.[5] Rita talked to Alvaro, Canto and Hernando in the presence of, at least, one other DEA agent. Guns were not displayed and the defendants were not `handcuffed during the course of the interview. Rita identified himself in Spanish as an Immigration Officer, the DEA agents also identified themselves.

Each defendant was given a Warning As To Rights Form which contained a listing of *Miranda* warnings. The forms signed by Alvaro, Canto and Hernando were in Spanish, and were explained in Spanish. The forms were read, explained and signed before the respective interviews by the Immigration and Naturalization Service ("INS") proceeded. Rita then asked a series of questions in order to establish each defendant's alienage and deportability. Rita followed the standard INS procedures when he attempted to locate the files on each defendant so that further documentation would be unnecessary. Once Rita was assured that no such records existed, he sought to verify defendants' statements concerning pedigree by obtaining a consent to search of each defendants' residence.

Each defendant signed a Consent To Search Form.[6] These forms were in English, but were translated into Spanish. Rita explained to all defendants that the items found during a consent search of their apartments could be used against them. The defendants were apprised of the fact that they had been arrested by a different agency and a representative from that agency would accompany INS to the defendants' apartments.

The threshold inquiry for the court is whether the cooperation between DEA and INS was proper. Here, Rita followed standard INS procedures, he questioned the defendants on matters pertaining to alienage and he did so only after being satisfied that he was dealing with an illegal alien. The court finds no showing of subterfuge on the part of INS or DEA. The cooperation between INS and DEA was proper. *See Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

The court is further satisfied that defendants Alvaro, Canto and Hernando understood their constitutional rights and knowingly and voluntarily waived those rights when they spoke to the government

---

5. Indeed, when Rita discovered that Rios had a Green card, he did not attempt to interview the defendant.

6. No Form was signed regarding the search of 2524 32nd Street.

agents.[7] An explicit statement of waiver is not invariably necessary to support a finding that a defendant waived his constitutional rights. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). In light of the testimony given by Rita, there is no showing of coercion. The statements were freely given.

It is well settled that when a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was freely and voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Voluntariness is a question of fact to be determined from the totality of all the circumstances. *Id.* at 223, 93 S.Ct. at 2045. The court has assessed the totality of all the circumstances and is satisfied that the defendants were advised of their constitutional rights with respect to each search, understood those rights and thereafter voluntarily and knowingly consented to the search of their apartments.[8] Here, there was no use of physical punishment, the defendants were aware of the possible consequences of such a search, the defendants refused to answer questions put before them [9] and defendants were aware that DEA agents would be present during the search.

Several incriminating items were seized by the government during the course of the consent searches. Here, each defendant was apprised of the fact that items seized during a consent search could be used against them at a later date. Nonetheless, Alvaro consented to the search of his residence at 4512 30th Avenue so that identification papers could be procured. Rita testified that while looking for such documenta-

tion a clear plastic bag containing white powder was found on a shelf inside a closet. That bag was given to DEA agents. Once the identification papers were found, the agents terminated the search.

Canto also consented to the search of three residences. Rita testified that he was accompanied by DEA agents. Upon entering the 2524 32nd Street address, the agents properly conducted a protective search. Rita then looked for identification papers. A large bag was found near a closet. Rita opened the bag and found it to contain two guns and some white powder. These items were given to the DEA agents. After a one hour search, no identification papers were found. The agents proceeded to the 1221 30th Avenue address. A Spanish couple, who knew Canto, resided at that address. Once it was determined that Canto had no authority to consent to a search of these premises, the agents left. Rita testified that a search was then to be made of Canto's 3324 Parsons Boulevard residence. The agents arrived at 3324 and presented a picture of Canto to the Superintendent's wife. She did not recognize him. At that point, the agents terminated the search.

The consent to search the various apartments for identification involved the potential for an extensive search. The seizure of a plastic bag in plain view on a shelf in a closet and the seizure of a large bag on the floor of a room, were properly seized during the course of a valid consent search. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Jones*, 528 F.2d 303 (9th Cir.), *cert. denied*, 425 U.S. 960, 96 S.Ct. 1745, 48 L.Ed.2d 206 (1975); *United States v. Canada*, 527 F.2d 1374 (9th Cir.), *cert. denied*, 429

---

7. During the course of the hearing, the translator's under oath stated that the defendants understood what was being said.

8. While a Consent to Search Form for Canto's 3324 Parsons Boulevard address was signed by Canto, no similar Form was signed for the 2524 32nd Street residence or the 1221 30th Avenue residence. A signed waiver form is not a *sine qua non* to a finding that a defendant voluntarily waived his constitutional rights; the totality of all the circumstances must be examined. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93

S.Ct. 2041, 36 L.Ed.2d 854 (1972). The court is satisfied that the agents acted pursuant to a proper consent search of Canto's residences. Rita testified that Canto admitted staying at other residences and permitted INS to verify his alienage by searching for documentation at these addresses.

9. Rita testified that Alvaro refused to answer questions put forth by Palumbo and Palumbo terminated his inquiry.

U.S. 867, 97 S.Ct. 177, 50 L.Ed.2d 147 (1975); *United States v. Grant*, 427 F.Supp. 45 (S.D.N.Y.1976); *Chandler v. State of Maryland*, 360 F.Supp. 305 (D.C.Md.1972). The court is satisfied that the search for identification did not evolve into a general exploratory search from one object to another until something incriminating at last emerged.

*Conclusion*

Insofar as the arrests and detention of defendants were proper and the search of the Monte Carlo and defendants' residences were constitutional, the court must deny *in toto* defendants' motions.

So ordered.