**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Johnny WILLIAMS, Gregory Leon Murchison, Lawrence Daniels, charged as Paul Abrams, Defendants-Appellants.**

**Nos. 79–1454, 79–1470 and 79–1561.**

United States Court of Appeals, Ninth Circuit.

April 7, 1980.

Rehearing Denied in No. 79–1470 May 29, 1980.

Certiorari Denied Oct. 6, 1980. See 101 S.Ct. 197.

Judy C. Clarke (argued), Frank T. Vecchione, San Diego, Cal., on brief; Kenneth R. McMullan, San Diego, Cal., for defendants-appellants.

Roger W. Haines, Jr., Asst. U. S. Atty., argued, Michael H. Walsh, U. S. Atty., Roger W. Haines, Jr., Asst. U. S. Atty., on the brief, San Diego, Cal., for plaintiff-appellee.

Before PECK,* ANDERSON, and NELSON, Circuit Judges.

NELSON, Circuit Judge:

Defendants in this case appeal their convictions for conspiracy to manufacture and attempt to manufacture the controlled substance phencyclidine ("PCP"). Five hours after border patrol agents arrested the defendants (Williams, Daniels, and Murchison), Narcotics Task Force ("NTF") agents conducted a warrantless search of the Pace Arrow motor home that the defendants had been travelling in and another warrantless search of the white-over-red Cadillac that the defendants had also used. In both vehicles, the agents discovered raw chemicals and paraphernalia associated with the manufacture of PCP.

Defendants argue that they were arrested without probable cause and that these arrests taint the evidence found in the motor home and the Cadillac. They also contend that the evidence should have been excluded at trial because no exigent circumstances justified the failure of the Narcotics Task Force agents to obtain a warrant. In addition, defendant Murchison asserts that the evidence introduced against him shows no more than his mere proximity to illegal drugs and his mere association with those who controlled them. He argues that such evidence alone cannot support his conviction and that the trial court erred in denying his Rule 29 motion for acquittal. We reject these contentions, however, and affirm the convictions.

## Statement of Facts

At about two in the morning on December 9, 1978, Border Patrol Agent Molloy was driving south on Highway 79 and passed three southbound vehicles in the vicinity of the Vail Lake area of Rancho,

---

* Honorable John W. Peck, Senior United States Circuit Judge, Sixth Circuit, sitting by designation.

California. One of these was a dilapidated green Ford; the others were a white-over-red Cadillac and a Pace Arrow motor home. Some time later, Molloy was travelling north on the same highway and noticed the motor home and the Cadillac parked at a cafe and a gas station that were closed for the night. He proceeded to travel northward, when he received a report from another border patrol agent that a green Ford a mile or so north of him had been seen parked next to an empty border patrol car and that the driver had acted suspiciously when a tow truck operator arrived and asked what he was doing.

Molloy caught up to the Ford, the same one he had seen with the motor home and the Cadillac less than an hour before. Molloy noted that it was not a local car and that it was riding low, and he suspected that the driver of the car might be smuggling illegal aliens. When Molloy stopped the car and asked the driver if he could look in the trunk, the driver responded that Molloy was welcome to look, but that he did not have a key. He added, however, that his uncle in the Pace Arrow by the cafe had one. He also said his uncle's name was Williams.

Leaving the car with other agents, Molloy returned with the driver Fenter to the cafe. There he knocked on the door of the Pace Arrow, and defendant Williams answered it. When Molloy asked him if he had a nephew in the area, Williams asserted first that he did, and then that he did not. The others in the motor home were also asked if they had a nephew in the area or any nephew at all, but none replied. Molloy then asked all of them if they knew anything about the Ford or if they had a key to it. Several of them answered no, and Williams, speaking for the entire group, told Molloy that no one in the motor home had a key to anything.

Molloy returned to the Ford, and with the help of several other border patrol agents he broke into its trunk, and found several cardboard boxes containing beakers, plastic bags filled with white powder and wet paper towels that reeked of a strong chemical odor. After this discovery, Molloy and others returned to the motor home, which had, in the interim, started to travel northward, but subsequently stopped near another gas station.

Using his car's public address system, Molloy instructed all those inside to come out. Among the five inside the motor home at this time were Williams and the two other appellants, Daniels and Murchison. They were frisked for weapons, and placed in back of two border patrol cars. Then two border patrol agents briefly went inside the Pace Arrow for less than a minute to ensure that no one else remained inside. Inside the motor home they observed several 5-gallon water containers.

About five hours later (at about 8:00 AM), agents from the Narcotics Task Force arrived. Shortly after they arrived, they searched the motor home. They found three 1-gallon jugs of piperidine in a bathroom cabinet in the rear of the motor home, a box of baking soda and six bottles of lye in the bathtub, twelve blue-tinted 5-gallon water jugs on the floor between the bunks, a 5-gallon plastic bucket, a pair of heavy rubber gloves, a triple-beam balance scale, and a mask-type breathing apparatus on the floor of the motor home to the right of the doorway.

In the interim, agents had found the white-over-red Cadillac hidden behind a number of junk cars near where Molloy had seen it parked with the motor home. The NTF agents towed the Cadillac several miles to a dirt lot across from the gas station where the Pace Arrow had stopped before the agents took custody of the defendants. The agents then broke into the trunk of the Cadillac and found significant quantities of cyclohexanone, hydrochloric acid, bromobenzene, and ether. Neither search was conducted with a warrant.

### Probable Cause to Arrest

■ When the defendants were told, at gun point, to come out of the motor home and were frisked and placed in the back of a border patrol sedan, they were arrested within the meaning of the fourth amendment. *Dunaway v. New York*, 442 U.S.

200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *United States v. Chamberlin,* 609 F.2d 1318 (9th Cir. 1979). Because evidence seized as a result of an illegal arrest must be suppressed, *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), we must determine if these arrests were made with probable cause, that is, we must decide if, at the time they apprehended the defendants, the agents had enough information to "warrant a prudent man in believing that [the defendants] had committed or [were] committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).

Another case would present itself if nothing linked the Ford with the motor home, but only a short time before Agent Molloy had seen the Ford and the motor home travelling in tandem, and the driver of the Ford had said he was travelling with Williams and identified Williams as the driver of the motor home. Moreover, Agent Molloy had questioned Williams and had found his conduct suspicious and his answers evasive.

The materials the agents found in the trunk of the Ford included not only large packages of white powder, but also metal shavings, wet paper towels, beakers, and rubber gloves. These suggested that the driver of the car was engaged in the manufacture as well as the transportation of controlled substances, yet except for the mobile home there did not appear to be any place where the manufacture could be taking place. The possibility that the motor home was being used as a mobile lab further strengthened the link between the contraband and those inside the motor home.

We emphasize that the evidence supports the inference not merely that the motor home was being used as a mobile lab or that one of its occupants was using the Pace Arrow as a lab, but also that all those inside the Pace Arrow had to be involved in the activity. Those inside a mobile laboratory travelling on a seldom used road in the middle of the night are not like those who by chance are in a bar when police have probable cause to search it. *Cf. Ybarra v.*

*Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) ("A person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause.").

The case before us is distinguishable both from *United States v. Beck,* 598 F.2d 497 (9th Cir. 1979), and *United States v. Chamberlin,* 609 F.2d 1318 (9th Cir. 1979). In *Beck,* agents stopped the defendants travelling in a car after having them under surveillance for four days. During the entire 4-day period, they had observed neither evidence of any controlled substances nor evidence of anything else that would suggest that the defendants were committing a particular crime. There was "a strong suggestion that the stop and detention was a pretext or subterfuge to enable the officers to conduct a warrantless search after having failed to otherwise substantiate their suspicions." 598 F.2d at 502. By contrast, in this case the agents had evidence that a particular crime was being committed. They were able to link the defendants with a car in which they had just found a large quantity of contraband.

In *Chamberlin,* a police officer on a routine patrol recognized the defendant and a companion walking in the Chicano Park area of San Diego after midnight. The police officer knew that they had extensive criminal records for narcotics violations, receipt of stolen property, forgery and burglary, and he noticed that they both quickened their pace and looked worried as he passed in his patrol car. A minute or so later he stopped the defendant, but not his companion, who had run away when the officer approached the second time. The officer asked the defendant why his companion had fled, and the defendant denied knowing him, a fact the police officer knew was not true. At this point the officer detained the defendant and began to search for his companion. The officer had a reasonable suspicion that criminal activity was afoot and therefore was justified in stopping the defendant and asking him a few brief questions. 609 F.2d at 1323; *see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20

L.Ed.2d 889 (1968). Nevertheless, the officer lacked any evidence that would warrant his believing that the defendant had committed a particular criminal offense. We therefore held that detaining the defendant was improper and violated his fourth amendment rights. 609 F.2d at 1323–24; see *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). By contrast, in the case before us, the agents knew more than simply that the defendants behaved suspiciously in a high crime area in the early hours of the morning. They had reason to believe that the defendants were committing a specific criminal offense, because of the links they could draw between the cache of chemicals and laboratory equipment in the trunk of the Ford and the motor home that had been travelling with it.

Because we find that the agents had probable cause to arrest the defendants, we must address the question whether exigent circumstances justified the subsequent searches of the motor home and the Cadillac five hours later.

### The Searches of the Motor Home and the Cadillac

■ *The "Automobile Exception."* Other things being equal, a search of private property must be reasonable and it must be performed pursuant to a properly issued search warrant. *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235 (1979); *United States v. District Court*, 407 U.S. 297, 317, 92 S.Ct. 2125, 2136, 32 L.Ed.2d 752 (1972). The Government argues initially that its search in this case falls under the so-called "automobile exception" to the warrant requirement. Because they are inherently mobile and because reasonable expectations of privacy are less inside them than elsewhere, courts have traditionally applied warrant standards less strictly to cars than to other kinds of property. *Arkansas v. Sanders*, 99 S.Ct. at 2591; *Carroll v. United States*, 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925).

■ Yet, as the Supreme Court stated in *Coolidge v. New Hampshire*, 403 U.S. 443, 461–62, 91 S.Ct. 2022, 2035, 29 L.Ed.2d 564 (1971), "[t]he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." Under the facts of this case, we cannot conclude that the so-called "automobile exception," without more, justified the search of the motor home five hours after it had been stopped. First, there was no chance that the motor home would disappear in the short amount of time it would have taken the agents to obtain a warrant. The motor home had not been moving at the time the agents overtook it, nor had it moved in the five hours before the search. Indeed, all the occupants of the motor home, including its owner, had been arrested and were in custody.

■ Second, the vehicle in question was not an ordinary automobile but a motor home. Whatever expectations of privacy those travelling in an ordinary car have, those travelling in a motor home have expectations that are significantly greater. People typically do not remain in an auto unless it is going somewhere. The same is not true of a motor home, in which people can actually live. In the ordinary motor home, the glass is tinted or shades can be drawn so that passers-by cannot peer in. Moreover, many, like the one in this case, have beds and fully equipped baths, making them in some senses more akin to a house than a car. In light of both these factors, we cannot uphold this search merely because it was of a search of a motor home. *See Coolidge v. New Hampshire, supra; Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

*The Volatility of PCP.* The Government argues in addition that the search was justified because of the danger that, left unattended, chemicals used in the manufacture of PCP can ignite, explode, or emit hydrogen cyanide. The Government introduced testimony at the suppression hearing concerning the dangers inherent in the manufacture of PCP. None of these defendants directly attack the validity of this testimony. Instead, they asserted and continue to assert that the agents failed to obtain a warrant merely because they thought it

inconvenient, not because they thought the motor home or the Cadillac put them in any danger. As evidence supporting their position, appellants note that the NTF agents were not so fearful of fire or explosion that they thought they could not risk towing the Cadillac several miles.

The question whether exigent circumstances exist is largely a factual one. *United States v. Flickinger*, 573 F.2d 1349, 1356–57 (9th Cir. 1978). Because no findings of fact were made and because none were requested, we must uphold the trial court's denial of the motion to suppress if there is a reasonable view of the evidence that will sustain it. *See United States v. Miner*, 484 F.2d 1075, 1077 (9th Cir. 1973); *United States v. Bethea*, 598 F.2d 331, 333–34 (4th Cir. 1979); *United States v. Smith*, 543 F.2d 1141, 1145 (5th Cir. 1976); *Scarbeck v. United States*, 317 F.2d 546, 562 (D.C.Cir. 1962). The trial court denied the motion to suppress after it weighed the inferences that could be drawn from the officers' decision to tow the Cadillac against the statement of one of the officers at the suppression hearing that they entered the motor home because of the volatility of half-manufactured PCP. In this case, the Narcotics Task Force officers conducted their searches shortly after their arrival, and they had ample reason to suspect that the motor home and the two cars were being used at the time of the arrests as a makeshift mobile laboratory. On the basis of what was presented to it, the trial court could find that manufacture of this particular controlled substance under these conditions created special dangers. Therefore, we conclude that exigent circumstances justified the search of the motor home. Further, we reach the same conclusion about the search of the Cadillac, because the chemical odor emanating from it was significantly stronger.

## Sufficiency of the Evidence Against Murchison

Defendant Murchison also contends that the evidence, even when it is considered most favorably to the Government, was not such that a reasonable person could find him guilty beyond a reasonable doubt of conspiracy to manufacture PCP or attempt to manufacture it. Therefore, he argues, we should reverse the lower court's denial of a motion for acquittal under Rule 29.

On numerous occasions we have found evidence insufficient to support a conviction, when it showed nothing more than that the defendant had been travelling in a car containing controlled substances. In *United States v. Thomas*, 453 F.2d 141 (9th Cir. 1971), and *Bettis v. United States*, 408 F.2d 563 (9th Cir. 1969), we held that someone who was merely a passenger in an automobile that had marijuana concealed in it could not be convicted on just that evidence alone. Similarly, we held in *Murray v. United States*, 403 F.2d 694 (9th Cir. 1968), that a driver of a car could not, without more, be convicted of possession of heroin hidden in rubber contraceptives and tied to the body of one of the passengers. Nor can someone who is merely an unknowing chauffeur be convicted of possession of heroin in the control of his employer. *United States v. Gardner*, 475 F.2d 1273 (9th Cir. 1973). *But see United States v. Vargas-Rios*, 607 F.2d 831 (9th Cir. 1979) (numerous appearances of defendant during the course of negotiations and usefulness to enterprise showed his role in the illegal transaction was substantial, not insignificant and innocent). Most recently, in *United States v. Weaver*, 594 F.2d 1272 (9th Cir. 1979), we held that a passenger in a pick-up truck driven to a motel parking lot could not be convicted of conspiracy to distribute and possess cocaine or for aiding and abetting with the intent to distribute cocaine, even though the package of cocaine was subsequently found beneath the passenger seat of the pick-up. There was simply too great a chance that there was some reason for Weaver's presence other than his participation in the conspiracy for his conviction to stand.

But the case before us is distinguishable. First, unlike the other cases, the chemicals and equipment used to make PCP were not carefully secreted. Indeed, the

gas mask, the triple-beam balance scale, and the twelve 5-gallon water bottles were in plain view, and all three vehicles emitted a chemical odor. A reasonable person could infer that defendant Murchison knew that the motor home was being used as a mobile PCP laboratory. Mere knowing presence in such a laboratory does not itself constitute an offense, but the special circumstances of this case allow a reasonable person to infer more than mere knowing presence. On the contrary, it would have been unreasonable and unrealistic for a jury to draw the conclusion that Murchison was not entirely aware of the presence and existence of the manufacturing paraphernalia and the chemicals. The other admitted or well-established facts could lead a jury to reasonably infer that this was a carefully planned mobile laboratory and that all of those participating in the excursion were active participants in the conspiracy and the attempt to manufacture PCP. While the evidence as to Murchison was in large part circumstantial, the elements of a conspiracy, like other factual determinations, may be proved by circumstantial evidence. *United States v. Friedman*, 593 F.2d 109, 115 (9th Cir. 1979); *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979); *United States v. Sanchez-Murillo*, 608 F.2d 1314, 1318 (9th Cir. 1979); *United States v. Smith*, 609 F.2d 1294, 1298 (9th Cir. 1979). All of the circumstances here were sufficient to justify submission of Murchison's guilt or innocence to the jury. The jury, on the basis of the evidence presented to it by the Government, could conclude beyond a reasonable doubt that Murchison was more than someone who was merely along for the ride. Unlike the defendant in *Weaver*, Murchison was not merely a passenger in an ordinary pick-up truck while someone else drove it to a motel parking lot and brought back a small wrapped package of cocaine. Murchison was in a motor home that was cluttered with laboratory equipment and that reeked of chemicals travelling in no particular direction far away from any city. A reasonable person might discover some explanation for Murchison's presence in the motor home that might make him or her doubt Murchison's active participation in the enterprise, but we cannot say that a person was unreasonable if he or she shared no such doubts.

### Conclusion

We hold that the border patrol agents had probable cause to arrest defendants Daniels, Williams, and Murchison, that exigent circumstances justified the warrantless search of the Cadillac and the motor home, and that the evidence presented by the Government was sufficient to withstand Murchison's motion for acquittal under Rule 29. Therefore, the convictions of all the appellants are

AFFIRMED.