UNITED STATES of America,
Plaintiff-Appellant,

v.

Michael Patrick WHEELER,
Defendant-Appellee.

No. 80–1390.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 3, 1980.

Decided April 9, 1981.

Rehearing and Rehearing En Banc
Denied July 8, 1981.

George D. Hardy, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellant.

George C. Boisseau, Chula Vista, Cal., argued for defendant-appellee; Jan Ronis, Chula Vista, Cal., on brief.

Before CHOY and NELSON, Circuit Judges, and HANSON,* Senior District Judge.

HANSON, Senior District Judge:

The defendant-appellee, Michael Patrick Wheeler, is under indictment for five counts of violation of 18 U.S.C. § 922(h) (possession by a convicted felon of firearms shipped or transported in interstate commerce), and one count of violation of 21 U.S.C. § 841(a)(1) (possession of a controlled substance with intent to distribute). The physical evidence against Wheeler was seized on February 22, 1980, during the execution of a federal search warrant. Following a hearing, the district court ordered the evidence suppressed as being the fruit of a prior illegal search of Wheeler's fenced yard by a San Diego County, California deputy sheriff. This is an appeal by the govern-

* The Honorable William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

ment, under 18 U.S.C. § 3731, of the district court's suppression order. We reverse.

## I.

The case turns on the reasonableness, under the Fourth Amendment to the Constitution of the United States and, arguably, under California law,[1] of certain actions of deputy sheriff Leonard Zuniga on Saturday morning, February 2, 1980. While he was on routine patrol at about 10 o'clock that morning, Zuniga was ordered by radio to go to 787B Dorothy Court in Chula Vista to meet with one Merguy and take a report on an alleged burglary. 787B Dorothy Court is one half of a duplex. The defendant-appellee, Wheeler, lives in 787A, the other half of the same duplex. Wheeler's yard is completely surrounded by a solid six-foot wooden fence, which is attached to the side of the garage (where there is a gate) and extends from there around the yard. The front door of A is inside the fence. The only other entrance to A from the streetside of the house is through the garage, which was closed when Zuniga arrived at 787B to take his report.

When he arrived at 787B, Zuniga met Merguy, who had recently moved out of B. Merguy told Zuniga that certain property, belonging to the owner of the duplex, was missing from the garage at B; the owner was seeking recompense from Merguy for the loss. The owner happened to be at the scene, making repairs on B, and he, Zuniga, and Merguy met together in front of B to discuss the situation. From this conversation Zuniga gathered that the missing property was in the possession of Wheeler, the tenant in A. According to the owner, Merguy had told Wheeler he could have the property; therefore, said the owner, Merguy should pay for it. Merguy, on the other hand, denied that he had told Wheeler he could have the property, and disclaimed liability to the owner.

During this initial conversation, Zuniga determined that he was faced with a civil (i. e., private) dispute rather than a criminal matter. Zuniga testified that it is within his jurisdiction to investigate civil matters. After some further discussion with the owner and Merguy about how they might proceed toward resolution of their problem, Zuniga decided to try to contact Wheeler and bring him into the discussion, apparently with the thought that bringing all the parties face to face in his presence might clear things up quickly. Zuniga, the owner, and Merguy walked over to 787A. Passing the closed garage door, they approached the

---

1. Before the Federal Rules of Evidence became effective on July 1, 1975, the rule in the Ninth Circuit was that the legality of searches and seizures by state officers had to be judged by both state and federal standards when challenged in federal prosecutions. *See United States v. Grajeda*, 570 F.2d 872 (9th Cir.1978) (*Grajeda I*). That rule was temporarily abandoned in *Grajeda I*, in view of Fed.R.Evid. 402, which provides that:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

However, *Grajeda I* was later withdrawn, the court concluding that since the police activities in that case were lawful under both state and federal standards, it need not reach the question of the continuing validity of the traditional rule. *United States v. Grajeda*, 587 F.2d 1017

(9th Cir.1978) (*Grajeda II*). Since *Grajeda II*, the Ninth Circuit has at least twice again avoided the question of the validity of the traditional rule on similar grounds. *United States v. Orozco*, 590 F.2d 789, 792 n.1 (9th Cir.), *cert. denied*, 442 U.S. 920, 99 S.Ct. 2845, 61 L.Ed.2d 288 (1979); *United States v. Chamberlain*, 609 F.2d 1318, 1321 n.1 (9th Cir.1979). We do the same here. We find no difference between federal and California law on the issues involved in this case. The California constitution contains a provision essentially identical to the Fourth Amendment at Art. I, sec. 13. *See* West's Ann.Cal.Const. Art. I, § 13. The California courts have generally interpreted Art. I, sec. 13 conformably to the federal courts' interpretations of the Fourth Amendment, although in isolated instances, unrelated to the factual circumstances of this case, Art. I, sec. 13 has been construed more strictly than the Fourth Amendment. *See People v. Brisendine*, 13 Cal.3d 528, 545–52, 119 Cal.Rptr. 315, 531 P.2d 1099 (1975).

gate in Wheeler's six-foot fence, heading for the front door of the house. The gate was closed and, as Zuniga concluded, locked on the inside. Zuniga could not see over the fence, being only five feet eight inches tall. There was, however, a gap of approximately one inch between the gate and the garage wall. Peering through this gap, Zuniga noticed several road safety signs, including a "pedestrian" sign and a big yellow sign that said "Flood," posted along the inside of the far part of the fence; he did not, however, see anyone in the part of the yard visible to him through the gap.[2] Zuniga and the others knocked on the garage door, but no one came to answer. At this point the phone inside A rang about four times and stopped. Zuniga decided to try to get the attention of whomever might be in A by calling out. After some yelling from the area in front of the garage proved fruitless, Zuniga climbed on top of two tires that he found stacked next to the fence, so that he could call over the fence toward the front door. While he was calling from on top of the tires he had a clear view of Wheeler's yard. He saw, besides more road signs posted on the inside of the fence and on the garage wall, a marijuana plant growing toward the back of the yard. One of the road signs Zuniga saw from atop the tires had a National City, California ordinance printed on it. This was the first indication Zuniga had that some of the road signs posted in the yard had come from San Diego County.[3] Zuniga maintained his position on the tires for about two minutes, calling out for Wheeler. When he concluded that he would not be able to raise anyone in this way, he got down, told the owner and Merguy that they would simply have to

pursue the matter of the missing property civilly, and went on his way. At no time did he make any attempt to climb over Wheeler's fence or otherwise enter farther on the property than has just been recounted.

The subsequent actions of Zuniga and other law enforcement officials are not here at issue. Zuniga told his superiors about the road signs and marijuana plant he had seen in Wheeler's yard. After contacting the California Department of Transportation, Zuniga's superiors concluded that possession of the road signs was probably unlawful. A state search warrant was obtained permitting the San Diego County police to search Wheeler's premises for marijuana and its common accessories, and for road signs in good repair, and to seize the same if found. In the course of executing this warrant on February 8, 1980, the police observed three rifles in a gun rack in the den of Wheeler's residence. A record check was subsequently run on Wheeler, and it was discovered that he had been convicted of a felony in California in 1971. Officials at the Bureau of Alcohol, Tobacco and Firearms were notified about the apparent violation of the federal firearms statutes; they obtained a federal warrant to search for and seize the guns; and during the execution of that warrant on February 22, 1980, not only were the guns seized, but Wheeler was allegedly observed throwing a packet over his fence, which allegedly proved to contain methamphetamine. Wheeler concedes that if Zuniga's February 2 observations of the road signs and marijuana plant were lawful, the evidence seized on February 22 is not subject to suppression; conversely, the government concedes that if

**2.** There was some question raised at the suppression hearing about whether Zuniga merely chanced to notice the road safety signs through the gap as he was walking toward the gate, or whether he deliberately peered through the gap. I assume that he deliberately looked.

**3.** I mention this fact because, if I were to find that Zuniga acted lawfully in peering through the gap but that he acted unlawfully in climbing up on the tires, there would be some ques-

tion about whether his lawful observations through the gap, by themselves, would have provided probable cause for the issuance of a warrant to search for road signs in good repair. See my discussion of the state search warrant executed on February 8, 1980, *infra*. Because I conclude that Zuniga acted unlawfully neither in looking through the gap nor in climbing up on the tires, I need not and do not consider this matter any further.

Zuniga's observations were unlawful, the evidence must be suppressed.

## II.

The district court ordered the evidence suppressed because, it held (in an opinion delivered from the bench), Zuniga's observations constituted an unreasonable search of Wheeler's back yard, in which Wheeler had a subjective and objectively reasonable expectation of privacy. The district court rejected the government's argument that Zuniga's observations were lawful because they were inadvertent (i. e., unsoughtafter) observations of incriminating objects in plain view from places where Zuniga had the right to be under the circumstances, namely, next to the gate and on top of the tires. The court conceded that Zuniga's observations were inadvertent and not directed toward the discovery of wrongdoing on the part of Wheeler: "He didn't see anything wrong. He didn't know anything was wrong. He wasn't searching for any bad conduct of any kind ...." [4] But the court held nevertheless that the observations were made in the course of a search—for Wheeler; and that they were not made from places where Zuniga had the right to be under the circumstances. This last conclusion was not based on the premise that Zuniga committed a physical trespass on Wheeler's property in order to look through the gap and over the fence: in its only remarks addressed to the matter of trespass, the court said that "... from the pictures it would seem that he may have and he may not have because I can't tell where the property stops and where it

doesn't." [5] Instead, the court held that whether or not he physically trespassed, Zuniga had no right to put his eye to the gap and climb on the tires because in doing so he was going to unreasonable lengths to try to rouse Wheeler. In the view of the district court, Zuniga didn't really need to see Wheeler at all in order to deal with the problem he was faced with, and therefore shouldn't have tried so hard to contact him; Zuniga should have been satisfied with knocking on the garage door and calling from in front of the garage; and especially after the phone rang four times and stopped, he should have concluded that no one was home and given up his efforts.[6] By going farther than this—by looking through the gap and by climbing on top of the tires to call—Zuniga unreasonably intruded visually on an area that Wheeler had obviously sought to and had taken reasonable steps to keep free of visual intrusion. This, the district court held, constituted an unreasonable search in violation of the Fourth Amendment, requiring the suppression of the fruit of Zuniga's observations, the evidence seized on February 22.

## III.

█ I conclude that the district court erred in rejecting the government's "plain view" argument, that Zuniga's observations were lawful because they were of objects in plain view from places where Zuniga had a right to be under the circumstances. The general rule is that such plain view observations do not constitute unreasonable searches,[7] under either the Fourth Amendment or California law. *See, e. g., Harris v.*

4. Reporter's Transcript (RT) at 57.

5. RT at 56.

6. RT at 53–54. As to the ringing phone, the district court said that:
   Then, he heard the phone ring ... approximately four times ... lending more credence to the fact that no one was home.
   I presume your argument is that, well, you could have let the phone ring a dozen times. On the other hand, if the person gets the wrong number, and realizes it, which I have

done on many occasions, when the phone starts to ring, you hang up.
   You know that really is a kind of enigma. RT at 54.

7. It is sometimes said unqualifiedly that plain view observations from places where an officer has a right to be do not constitute "searches" at all within the meaning of the law of search and seizure. *See e. g., United States v. Orozco, supra,* and both federal and California cases cited therein. Such a characterization of plain view observations might be appropriate in

*United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *United States v. Coplen*, 541 F.2d 211 (9th Cir.1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 791 (1977); *People v. Rios*, 16 Cal.3d 351, 128 Cal.Rptr. 5, 546 P.2d 293 (1976). The crucial issue of course, is Zuniga's right, under the circumstances of this case, to be where he was when he made the observations that eventually brought Wheeler to his present pass. Since my analysis of this issue entails the rejection of no finding of fact made by the district court, I review that court's holding on the issue de novo, rather than under the clearly erroneous standard. *Cf. United States v. Bates*, 533 F.2d 466 (9th Cir.1976).

◼ I point out to begin with that it would be helpful, for purposes of analysis, to know whether or not Zuniga physically trespassed or entered on property rightfully in Wheeler's possession. If he did not, I hardly see how it can be said that he did not have the right to be where he was when he made his observations.[8] If he was not on Wheeler's property he was evidently on either the duplex owner's or the city's proper-

ty. But he surely had the owner's implicit consent to be where he was, looking for Wheeler: the owner was there with him, also hoping to speak to Wheeler about the missing property; and of course Zuniga had every right to be on the city's property, if that is where he was. I have found no case, nor has any been cited to us, where an officer has been held to have acted unlawfully by making plain view observations, with his unaided senses, without physically intruding on property in which the defendant had some protected interest, from places occupied by the officer with the owner's consent or by other lawful right—and this even though the officer may have been deliberately searching for evidence of crime. On the contrary, the cases uniformly hold that if an officer saw (or heard or smelled) no more than a neighbor could see from his own property or that could be seen from a public place, then the defendant simply had no legitimate expectation of privacy in the place or objects observed, and there can therefore have been no unlawful intrusion on what is protected under the law of search and seizure.[9] However, it seems reasonable to conclude, and I shall

cases where the officer makes his observations while engaged in some business other than looking for something, *e. g.*, *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) (opening car door to roll up window against rain), or even in cases where, while the officer is looking for something, even evidence of crime, he violates no reasonable expectation of privacy, *e. g.*, *Orozco, supra*, *United States v. Coplen*, 541 F.2d 211, 214 (9th Cir.1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 791 (1977) (in such cases "surveillance" might be the better word). In this case the district court found that Zuniga made his observations while looking for Wheeler, and that in the course of this "search" he intruded on Wheeler's reasonable expectation of privacy in his yard. As I indicate in the text, I accept this characterization of the situation, but hold that Zuniga made no unreasonable intrusion.

8. Although I do not rest my holding on this point, I think it should be noted that the burden is on the party moving for the suppression of evidence to establish, at least prima facie, that the evidence is the fruit of an unlawful search or seizure. Only once such a prima facie case is made, by, *e. g.*, establishing a warrantless

intrusion on a protected area, does the burden shift to the government to show, *e. g.*, that the intrusion was reasonable. *United States v. Coleman*, 628 F.2d 961, 965 (6th Cir.1980); *United States v. Henry*, 615 F.2d 1223, 1230 (9th Cir.1980).

9. It would be pointless to pile up more than a short list of cases. *See, e. g., United States v. Ortiz*, 603 F.2d 76 (9th Cir.1979) (visual observation of interior of gas station from a public place); *United States v. Coplen, supra* (visual observation of interior of parked airplane with aid of flashlight); *United States v. Martin*, 509 F.2d 1211 (9th Cir.1975) (observation of activities within residence by sight, hearing and smell from adjoining yard with consent of neighbor); *United States v. Fisch*, 474 F.2d 1071 (9th Cir.1973) (observations with naked ears of conversations in adjoining motel room); *United States v. Honore*, 450 F.2d 31 (9th Cir. 1971), *cert. denied*, 404 U.S. 1048, 92 S.Ct. 728, 30 L.Ed.2d 740 (1972) (visual observations of objects within residence through uncurtained window from public stairway); *Ponce v. Craven*, 409 F.2d 621 (9th Cir.1969) (observations by unaided sight and hearing through partially open bathroom window of motel room from

assume, that Zuniga was on property rightfully in Wheeler's possession when he made his observations. He was on Wheeler's driveway next to Wheeler's gate, and on top of what were apparently Wheeler's tires stacked next to Wheeler's fence. I assume also, for purposes of analysis, that the district court correctly characterized Zuniga's action as a "search," namely, for Wheeler. Finally, I assume that in the course of his search Zuniga intruded visually on an area in which Wheeler had at least a limited reasonable expectation of privacy. The question remains whether Zuniga acted reasonably in so intruding during the course of such a search as he was making. Unlike the district court, I believe that he acted reasonably.

The Eighth Circuit was confronted with a situation strikingly similar to the circumstances of the instant case in *United States v. Anderson*, 552 F.2d 1296 (8th Cir.1977). In *Anderson*, federal agents went to the home of one Wood, apparently after dark, to question him about a theft.

> The agents rang the doorbell and knocked, but no one appeared. A light was visible inside the house and the agents heard a dog barking behind it. After waiting briefly, they walked around the house to determine if there was someone with the barking dog. As they walked along the side of the house, they noticed a lighted basement window partially covered by a shade. Glancing through the window, they saw [the stolen property]. After observing the [property], the agents proceeded to the back porch where they saw the dog alone. They then returned to the front of the

house. No attempt to seize the [property was made at that time].

552 F.2d at 1298. The court held that the subsequent seizure of the stolen property pursuant to a warrant based on the agents' observations was not the fruit of an illegal search. The court noted that the question of legality turned on a dual inquiry:

> [F]irst, whether the agents' observation was made in a place to which Wood's expectation of privacy could reasonably be said to extend; and second, if so, whether the agents' intrusion was justified by "some * * * legitimate reasons for being present unconnected with a search directed against the accused." *Coolidge v. New Hampshire*, [403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971)].

552 F.2d at 1299–1300. The court went on to hold that:

> [W]hen the agents entered Wood's property, they invaded an area with respect to which he had a reasonable expectation of privacy protected by the Fourth Amendment. This initial intrusion was justified, however, by the agents' legitimate objective of finding Wood to question him about the theft. *See, e. g., United States v. Bradshaw*, 490 F.2d 1097, 1100 (4th Cir.), *cert. denied*, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974); *United States v. Hersh*, 464 F.2d 228, 229–30 (9th Cir.), *cert.denied*, 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 301 (1972). We cannot say that the agents' action in proceeding to the rear after receiving no answer at the front door was so incompatible with the scope of their original purpose that any evidence inadvertently seen by them

adjacent parking lot); *People v. Rogers*, 21 Cal.3d 542, 146 Cal.Rptr. 732, 579 P.2d 1048 (1978) (visual observation of interior of van parked in municipal parking lot with aid of flashlight); *and see* cases reviewed in *Lorenzana v. Superior Court*, 9 Cal.3d 626, 632–33, 108 Cal.Rptr. 585, 511 P.2d 33 (1973). Although its rationale is not entirely clear, *United States v. Hersh*, 464 F.2d 228 (9th Cir.), *cert. denied*, 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 301 (1972), relied on here by the government, apparently

falls into this class of "no legitimate expectation of privacy" cases. *Compare Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (electronic listening devices attached to outside of phone booth violated reasonable expectation of privacy); *United States v. Kim*, 415 F.Supp. 1252 (D. Hawaii 1976) (telescopic surveillance of apartment from building a quarter of a mile away violated reasonable expectation of privacy.

must be excluded as the fruit of an illegal search. *See United States v. Bradshaw, supra* at 1100.

552 F.2d at 1300 (footnote omitted). In the omitted footnote the court held not clearly erroneous the trial court's finding that the agents had not acted under a mere pretext for an illegal search when they proceeded to the back of the house to investigate the barking dog. 552 F.2d at 1300 n.5.

I find *Anderson* persuasive here; indeed, this case is even stronger than *Anderson*. Zuniga did not go to Wheeler's home in the nighttime; he was called there at midmorning on a Saturday. He did not look into Wheeler's residence; he merely looked into his yard. There can be no question about whether Zuniga acted under some pretext to search Wheeler's premises; the district court's uncontested finding is to the effect that when he approached Wheeler's residence his sole purpose was to bring Wheeler into the discussion with the owner of the duplex and Merguy about what Zuniga had already determined was a purely civil matter. There is no evidence in the record that Wheeler had any "no trespassing" signs posted around the outside of his house or fence.

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof— whether the questioner be a pollster, a salesman or an officer of the law.

*Davis v. United States*, 327 F.2d 301, 303 (9th Cir.1964). When Zuniga approached Wheeler's residence he found the garage closed and the gate leading to the front door locked. Before knocking or calling out, he looked through the gap there in front of him to see if anyone was in the yard. He might have knocked or called out first instead, and perhaps thereby have obviated the need for looking; but I cannot say that he acted unreasonably by looking first; he might thereby have been able to direct his knocking or calling more intelligently, and he did only what any other visitor might have done. Wheeler could have prevented such expectable visual intrusions by somehow covering up the gap, but he did not do so; he thereby diminished his legitimate expectation of privacy from such visual intrusion. Similarly, it was apparently Wheeler who left the tires stacked next to his fence, where anyone passing by could climb up and look into his yard; Wheeler could have put the tires elsewhere in order to prevent this, but he did not do so. After knocking and calling unsuccessfully from in front of the garage, but after hearing the phone ring four times and stop, Zuniga climbed on top of the tires so he could call out more effectively over the fence toward the front door. He might have concluded from his earlier lack of success and the phone's behavior that no one was at home; but I cannot say that his failure to come to that conclusion was unreasonable. Certainly the brief ringing of the phone was an enigma, as the district court itself observed; and if anyone was at home, Zuniga's earlier failures to rouse him might well have been due to the poor position from which his efforts were directed. The tires were there to be climbed on; the position they offered was clearly better suited to Zuniga's purpose of calling out for Wheeler; and the further intrusion on Wheeler's property and privacy was minimal As in *Anderson*, I conclude that Zuniga's action in climbing on the tires to try once more, from a better position, to get Wheeler's attention, was not so incompatible with his legitimate purpose that the fruits of his inadvertent observations must be excluded as the fruits of an illegal search.

In sum, I conclude that Zuniga acted reasonably and so had the right to be where he was when he made the observations here challenged. Since the observations were of

objects in plain view from places Zuniga had a right to be, they did not constitute unreasonable searches. Accordingly, the fruits of the observations, the items of evidence seized on February 22, 1980, are admissible in evidence against Wheeler.

REVERSED AND REMANDED.

CHOY, Circuit Judge, concurring in result:

I concur in the result reached by Judge Hanson but I base my decision on the cases alluded to in his footnote 7.

The activities of Officer Zuniga are not properly characterized as a search because he had a right to be where he was when he made the observations. Zuniga was with the landlord attempting to locate Wheeler to settle a civil dispute. "It is well settled that visual observation by a law enforcement officer situated in a place where he has a right to be is not a search within the meaning of the fourth amendment." *United States v. Orozco*, 590 F.2d 789, 792 (9th Cir.1979); *United States v. Coplen*, 541 F.2d 211, 214 (9th Cir.1976).

Wheeler had no legitimate expectation of privacy from visual intrusion into his yard. A six-foot fence such as Wheeler's could easily be looked over by a person six feet or taller in height. In addition there was a gap in the fence through which anyone was able to see the yard and some of its contents. Wheeler also had tires stacked up next to the fence which any person passing by could stand on to look into the yard. I base my decision solely on these grounds and therefore do not reach the issue of whether an intrusion into an area where a person had an expectation of privacy can be justified by other legitimate reasons.

NELSON, Circuit Judge, dissenting:

Because the majority in this case places an untenably high burden on the private citizen in creating a legitimate expectation of privacy, I respectfully dissent. The two majority opinions, which rely on distinct although superficially similar analyses, will be discussed separately below.

*I. Judge Hanson's Opinion*

As a starting point I assume, as Judge Hanson does, that the court below correctly characterized Zuniga's actions as a search, albeit a search for a person. Doctrinally, we would thus seem to be placed squarely within the realm of the Supreme Court's often quoted statement found in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1972), that "a search conducted without a warrant issued upon probable cause is '*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Id.* at 219, 93 S.Ct. at 2043 (ellipses in original), *quoting Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). The exception Judge Hanson apparently relies on is the plain view doctrine, which authorizes warrantless seizures in certain limited circumstances.[1]

A crucial element of the plain view doctrine is that there must have been a "prior justification for an intrusion in the course of which [the police officer] came across a piece of evidence incriminating the accused." *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). Like Judge Hanson, I assume that Zuniga intruded on an area in which Wheeler had at least a limited reasonable expectation of privacy. Unlike Judge Hanson, I cannot find that a police officer's legitimate desire to contact an individual in order to solve a civil dispute authorizes him to take such extreme steps as putting his eye next to a six foot privacy fence with a gate that the officer then knew was locked, peering through a small crack and subse-

1. Although the plain view doctrine is formulated in terms of warrantless seizures, I have no intrinsic doctrinal difficulties with applying it to a situation where, as Judge Hanson concludes occurred here, evidence inadvertently discovered in plain view is used not to justify an on the spot seizure but to supply probable cause for a warrant.

quently climbing on top of a stack of tires to peer over the fence.[2]

Clearly the officer's legitimate purpose entitled him to knock on the garage and to call out to attempt to contact Wheeler (and I note that the officer testified on cross-examination that he did not call out to anyone on the other side of the fence until he was on top of the tires). But I cannot agree that the extraordinary steps taken by Zuniga can be justified as reasonable.

Judge Hanson attempts to buttress his argument by asserting that Wheeler's privacy interest was limited, claiming that he could have sealed off the one inch crack where the fence met the building and removed the tires that Judge Hanson apparently considers to be an open invitation to passers-by to climb on in order to peer in. I cannot concur in the imposition of such a high burden on citizens' attempts to preserve privacy. A six foot fence with a locked gate is not enough—apparently extraordinary efforts must be taken to close the gaps that may normally appear in such construction. If tires nearby are an invitation to passersby to climb, are not trees equally so? Or fire hydrants? To me this burden is much too great, and I accordingly must dissent.

## II. Judge Choy's Opinion

Judge Choy bases his opinion on the notion found in *United States v. Orcozo*, 590 F.2d 789, 792 (9th Cir.1979) and *United States v. Coplen*, 541 F.2d 211, 214 (9th Cir.1976) that "visual observation by a law enforcement officer situated in a place where he has a right to be is not a search within the meaning of the fourth amendment." Doctrinally, these cases involve situations in which, because there is no legitimate expectation of privacy, there is no fourth amendment right. Thus in *Orcozo*, "[t]he deputies' looking through the windows of a vehicle parked on a public street did not violate appellant's reasonable expectation of privacy; anyone walking past the vehicle could easily have observed the packages of cocaine and heroin." 590 F.2d at 792. Similarly in *Coplen*, this court refused to find that a legitimate expectation of privacy was violated when an agent saw marijuana debris (admittedly with the aid of a flashlight as it was night) through the back window of an airplane parked at a public airport, noting that "if privacy were desired here, Coplen should have closed off the window from public view." 541 F.2d at 215.

This case is clearly distinguishable. This is not an open vehicle parked on a public street—it is a home. Here Wheeler did close off the area from public view—he put up a six foot solid fence[3], albeit with a small gap where the fence met the building. The contraband here was not easily visible—its identification required the officer to peer through a small hole and climb on top of tires. As I stated at the end of Part

2. It is the nature of this behavior that causes me to find the Eighth Circuit's *Anderson* case relied on by Judge Hanson to be distinguishable without having to evaluate its merit. To me there is a significant distinction between glancing through a window as one passes it and the far more strenuous and intrusive behavior involved here.

3. Judge Choy finds that a six foot fence is not tall enough to create privacy—it "could easily be looked over by a person six feet or taller in height." Assuming that most people have approximately four to five inches between their eyes and the top of their heads, and given the additional height necessary to look down over an obstacle such as a fence, it seems more realistic to believe that such a fence could be "easily" looked over only by individuals six feet five inches or taller (who, in order to see into the yard, would also have to be standing quite close to the fence). Given that less than one percent of the American adult population is six feet four inches or taller, *see* National Center for Health Statistics, U.S. Department of Health, Education and Welfare, *Weight and Height of Adults 18–74 Years of Age: United States, 1971–74* 27, I have to question strongly Judge Choy's conclusion. To me, a fence that effectively screens out more than 99% of the population does create an expectation of privacy. I also take judicial notice of the fact that Chula Vista zoning ordinances limit the height of such fences to six feet. Wheeler has thus done all the law permits him to do in terms of fence height to create privacy. I cannot see how the majority can demand still more.

I, I find Wheeler's efforts sufficient to create a legitimate expectation of privacy.

I would affirm the district court.