Stephen and Janette MILLER *v.* STATE of Arkansas

CA CR 99-550                                        13 S.W.3d 588

Court of Appeals of Arkansas
Divisions I, II, and III
Opinion delivered March 8, 2000

*Bassett Law Firm*, by: *Woody Bassett*; and *Charles L. Stutte*, for appellants.

*Mark Pryor*, Att'y Gen., by: *David R. Raupp*, Ass't Att'y Gen., for appellee.

STEELE HAYS, Special Judge. Appellants Stephen and Janette Miller were charged with manufacturing marijuana and possession of drug paraphernalia in the Circuit Court of Washington County. They moved to suppress the evidence seized under a search warrant. Following a hearing, the circuit court denied the motion to suppress and the Millers entered written conditional pleas of guilty pursuant Rule 24.3 of the Arkansas Rules of Crimi-

nal Procedure. On appeal they maintain the ruling of the circuit court should be reversed. We disagree.

On the morning of October 22, 1998, the Millers were stopped for speeding on U.S. Highway 75 near Denison, Texas. The arresting officer, Sharalyn Fichtl, requested a warrant check on Stephen Miller and learned he had prior arrests for the sale of marijuana, possession of LSD, and possession of a weapon. She asked Miller if he had a weapon with him while traveling and whether he was carrying any contraband, which he answered in the negative. Officer Fichtl asked Miller if she could look in his vehicle. He agreed, adding that they would like to be on their way.

From beneath the front seat on the passenger's side, Officer Fichtl found a container with some two or three ounces of marijuana. In the trunk she found a package in purple wrapping, which Mrs. Miller explained was a gift for her sister and consented to Officer Fichtl's request to open it. The package contained twelve plastic bags of marijuana totaling three pounds in weight. The Millers were placed under arrest. The entire procedure was video-taped and recorded by audio recorder and later introduced into evidence at the suppression hearing.

The next day Officer Fichtl called Fayetteville and gave the Millers' Fayetteville address to Detective Mike Henderson, who relayed the information to Sergeant Kenny Yates. Yates and Detective Reynolds went to the residence to see if anyone was there. Yates knocked on the front door and got no response. He went to the back door and knocked and got no response. When he stepped on the back porch, he smelled a strong odor of marijuana and noticed potting soil, small pots, plant food, and similar items. The smell, he said, was obviously coming from inside the house, there being a gabled vent at the back of the house. Sergeant Yates left two officers to watch the house and proceeded to apply for a search warrant. As one of the officers at the scene was waiting, he walked around the Millers' backyard from a neighboring tract. From there he could see marijuana plants, two to three feet tall, growing in the backyard. He called to report this information, and the marijuana plants were added to the search warrant. The officers returned with the warrant, searched the house, and seized some ten pounds of marijuana, scales, bongs, and other drug paraphernalia. They also seized six marijuana plants from the yard.

On appeal, appellants renew their arguments that the evidence seized in Texas and Arkansas must be suppressed in accordance with Fourth Amendment constraints. They invoke the doctrine of the "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471 (1963).

■ When reviewing a trial court's ruling on a motion to suppress, we make an independent determination based on the totality of the circumstances and reverse only if the ruling is clearly erroneous or against the preponderance of the evidence. *Fouse v. State,* 337 Ark. 13, 989 S.W.2d 146 (1999); *Langford v. State,* 332 Ark. 54, 962 S.W.2d 358 (1998). Specifically, appellants argue the search of their residence violated the Fourth and Fourteenth Amendments to the Constitution of the United States and Article 2, Section 15, of the Arkansas Constitution. They claim the search of their vehicle was illegal and information given to the Arkansas police was tainted and hence could not support the search warrant ultimately obtained in Arkansas.

■ There is no contention that the initial stop of the Millers for speeding was improper; rather, they maintain they consented merely to the search of the interior of their vehicle and not the trunk, from which the bulk of the marijuana was retrieved. It does appear that in her written report Officer Fichtl wrote that she asked if she could look "inside" the vehicle. But in her testimony at the suppression hearing, she stated, "I asked if I could look in his vehicle," and the videotape verifies her testimony. Of greater import is what appellants understood they were consenting to, and the videotape reflects that Miller walked to the passenger seat and told his wife, "She wants to search the car." We are not persuaded that when someone consents to the search of a vehicle there is in any sense an implied exception of the trunk. Nor was there any objection from either appellant when Officer Fichtl opened the trunk.

Appellants also submit that there was a coercive element to their consent in that "Officer Fichtl stated that the Millers could be on their way if they first allowed her to search the vehicle and she found no contraband." But again the videotape refutes that version of events. It was not until after Stephen Miller had consented that anything was said about their moving on:

FICHTL: Okay. Do you mind if I look in your vehicle, make sure you don't have any illegal substances or large sums of cash or weapons or ...

MILLER: No, no.

FICHTL: ... contraband?

MILLER: Yeah, you can go ahead. I just wish we could go.

FICHTL: Okay, well if I can look, if there's nothing in there, then it will take me a couple of minutes—five minutes and I'll let you be on your way.

MILLER: Okay.

■ In sum, we believe the consent by appellants to the search of their vehicle was freely and voluntarily given and in no way stigmatizes the ensuing events in Arkansas, to which we now turn.

Appellants' attack on the seizure of evidence by the Fayetteville police is essentially threefold: (a) the police should not have gone to appellants' residence in the first place because "the officers knew that the occupants of the residence were incarcerated in Texas at the time they went to the residence";[1] (b) the police should not have gone to the back of the house; and (c) the police should not have gone onto a neighbor's property to scan appellants' backyard. All of these actions, they contend, violated appellants' right of privacy under the Fourth Amendment.

■ Argument (c) requires no extended discussion. Appellants have no standing to complain of any invasion of the property of their neighbors. *Richard v. State*, 64 Ark. App. 177, 983 S.W.2d 438 (1998); *Standley v. State*, 25 Ark. App. 37, 751 S.W.2d 364 (1988).

■ As to whether appellants were at home, the police may well have assumed they were still in Texas, but the fact of the matter must rest in uncertainty because the record tells us nothing of their whereabouts. But whether appellants were at home or away can have little bearing on the right of the police to investigate a nascent crime. In capsule, the Fayetteville police had been informed by another law enforcement agency that appellants had left Fayetteville the previous morning in a rented vehicle intending to spend two

---

[1] Appellants' brief, p. 136.

days in Dallas with no luggage. They were arrested near Denison for speeding, and a large quantity of marijuana—three pounds was found in the trunk in a package bearing a Fayetteville address. Coupled with that information was the fact that appellant Stephen Miller had a history of prior arrests for possession of marijuana and LSD. Whether that information alone would sustain a search warrant is not before us. Certainly it was reasonable cause for suspicion and an investigation, which would obviously entail going to the address to see if anyone was there. And even if it were a known fact the appellants were away, it does not follow that others might not have been there. The house could have been occupied by other family members, friends, housekeeper, or even a confederate, alerted by appellants as a consequence of their arrest. We believe the police, knowing what they knew, would have been remiss had they not paid a visit to the pertinent address.

That brings us to the back door. Appellants insist the police had no right to go there. They rely in part on *State v. Shepherd*, 303 Ark. 447, 798 S.W.2d 45 (1990), but the *Shepherd* case is distinguishable. There, the police, in conjunction with the prosecutor, used the prosecutor's subpoena power as a pretext to gain access to the subject property, which the trial court held was an abuse of the subpoena power and, hence, illegal. The supreme court affirmed. In this case, the police did not resort to a pretext; they went directly to the front door, which they, like countless others, had every right to do. The question is, did they over step the bounds of the Fourth Amendment by going to the back door?

We can locate no cases of our own or from our supreme court shedding light on this issue. The United States Supreme Court, in defining the broader concept of curtilage, noted four factors to be treated as useful tools in determining whether an individual reasonably may expect that the area in question should be regarded as private: the proximity of the area claimed to be curtilage to the home; whether the area is included within an enclosure surrounding the home; the nature of the uses to which the area is put; and the steps taken by the resident to protect the area from observation by passersby. *United States v. Dunn*, 480 U.S. 294 (1987).

A discussion by the federal appeals court in *United States v. Doaust*, 916 F.2d 757 (1st Cir. 1990), in which Doaust was convicted of unlawful possession of firearms after police searched his

home pursuant to a warrant based on the officers' observation of a gun through a back window in his house, is informative:

> The legal question is whether the police had a right to be at the back of the house where they saw the gun, or whether they were simply snooping.
>
> * * *
>
> A policeman may lawfully go to a person's home to interview him. *See Davis v. United States*, 327 F.2d 301, 303 (9th Cir.1964); *United States v. Wheeler*, 641 F.2d 1321, 1327 (9th Cir.1981); *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir.1977); *United States v. Bradshaw*, 490 F.2d 1097, 1100 (4th Cir.), *cert. denied*, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974). In doing so, he obviously can go up to the door, *see Davis*, 327 F.2d at 303, and, it seems to us, if that door is inaccessible there is nothing unlawful or unreasonable about going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person. *See, e.g., Anderson*, 552 F.2d at 1300 (reasonable for police to proceed to rear of house to look for back entrance); *Wheeler*, 641 F.2d at 1327 (reasonable for police to stand on tires to look over fence to see if anyone is at home); *United States v. Hersh*, 464 F.2d 228, 230 (9th Cir.), *cert. denied*, 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 301 (1972) (reasonable for police to look through window while standing at front door trying to locate and interview defendant). *But cf. Texas v. Gonzales*, 388 F.2d 145, 147 (5th Cir. 1968) (police have no right to look through window simply to see if drug activity is taking place inside).
>
> On the basis of this record the district court found that the police went to the back "looking for an accessible main floor entrance" not to see if unlawful activity was taking place, but as part of their efforts to interview Daoust. It further found that they looked up through the window simply to see if someone was at home. The record adequately supports these findings. *See United States v. Gerry*, 845 F.2d 34, 36 (1st Cir.1988); *United States v. Veillette*, 778 F.2d 899, 902 (1st Cir.1985), *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). And, that being so, the conduct of the police was lawful.

916 F.2d at 758.

Other courts have sanctioned attempts by police to contact residents by knocking at the back door. *See United States v. Garcia*, 997 F.2d 1273 (9th Cir. 1993);*United States v. Bradshaw*, 490 F.2d

1097 (4th Cir.), *cert. denied*, 419 U.S. 895 (1974); *Long v. State*, 532 S.W.2d 591 (Tex. Crim. App. 1975). The Eighth Circuit has held that the officers' legitimate objective of finding a resident to question him about a theft extended to their actions in proceeding to the rear of the house after receiving no answer at the front door. *United States v. Anderson*, 552 F.2d 1296 (8th Cir. 1976).

Here, there was no evidence the police engaged in any action except to knock at the front door and back door. There were no fences, shrubbery, barricades, or signs restricting access to the back of the house. In fact, there was testimony that a path led from the front of the house to the back and nothing to suggest that the area was off limits.

■ We conclude that any intrusion upon appellants' right of privacy under the Fourth Amendment by the Fayetteville police in knocking at the back door was, at most, minimal and did not approach the level of substantiality contemplated by our cases and the specific language of Rule 16.2(e) of the Arkansas Rules of Criminal Procedure.

■ Even if we could accept appellants' arguments, a crucial question would remain unanswered—was the discovery of the marijuana plants in the yard an exploitation of the "poisonous tree" doctrine? The burden on that issue, which the trial court was not asked to address, rests on the appellants. *Walton & Fuller v. State*, 245 Ark. 84, 431 S.W.2d 462 (1968).

For the reasons stated, the order of the circuit court denying the motion to suppress is affirmed.

Affirmed.

PITTMAN, CRABTREE, BIRD, and MEADS, JJ., agree.

ROAF, NEAL, GRIFFEN, and HART, JJ., dissent.

WENDELL L. GRIFFEN, Judge, dissenting. I agree with Judge Roaf that the police engaged in an illegal search in violation of the Fourth Amendment when they went to appellants' back yard having neither a search warrant nor probable cause to conduct a search. The State has presented no legal justification for conduct that is ordinarily considered trespassing at best, prowl-

ing at worst. But I write separately to emphasize the manner in which the police disregarded the appellants' rights.

I acknowledge that the police acted properly when they went to appellants' house and knocked on the front door, even though they lacked probable cause to search the residence. As Judge Roaf's opinion states, had the police been granted permission to effect a search despite lacking probable cause, they would have been entitled to use any contraband discovered in that search in a prosecution of appellants.

However, the police had solid information indicating that the appellants had been detained in Texas the day before on another drug possession charge following the discovery of illegal drugs in their vehicle. I cannot overlook the fact that the police knew they lacked probable cause to search appellants' house when they knocked on the front door and no one answered. Although the police claim that they went to the back door to determine whether anyone may have nevertheless been home who could consent to a search, that assertion is preposterous. There is nothing in the record indicating that the police had reason to believe anyone was home when they went to the house. Even if someone had been home, there was no requirement that they answer the back door in the first place, let alone admit the police to search without a search warrant.

So we are left with the chilling fact that law enforcement officers knowingly went to a private residence lacking probable cause to search for anything and lacking even enough information to warrant approaching a magistrate to apply for a search warrant. When they failed to obtain an answer to their knocks on what they clearly recognized was the front door — the most likely place that one would have expected the occupants to admit the visiting public — the police then left the front of appellants' house, walked around the house, and approached the back door. Intellectual honesty and common sense compel the conclusion that they were simply prowling around the house looking for something to justify entering it. The majority decision now sanctions this conduct as permissible investigatory police behavior consistent with the Fourth Amendment.

As a judge, I reject the notion that the so-called "war on drugs" entitles the police to prowl and pilfer through and across

private property at will without probable cause or a search warrant. In the first place, the Fourth Amendment was added to the federal Constitution to prevent such conduct by government agents in violation of the rights of people to privacy in their homes and on their lands. The purpose of the Fourth Amendment is to prevent unreasonable governmental intrusions into the privacy of one's person, house, papers, or effects; the wrong condemned is the unjustified governmental invasion of such areas of an individual's life. *United States v. Calandra*, 414 U.S. 338, 354 (1974). Unless police have probable cause or a search warrant which entitles them to enter onto private property and search for evidence of illegal behavior, people in our society have the right to be left alone. That right means that the police may not invite themselves onto private property merely in furtherance of conducting a "war on drugs."

Beyond that, however, I am concerned for the safety of the police and the citizens they are sworn to protect and defend. Given the increasing concern about crime in our society, property owners are understandably uneasy when confronted by uninvited persons on their property. Where the police lack probable cause to conduct a search and lack a search warrant yet insist on prowling around private property, it is not unreasonable to conceive that concerned property owners may consider their uninvited presence offensive. An uninvited visitor to one's front door is merely uninvited. But when the uninvited person leaves the front door and starts prowling elsewhere, his conduct can easily be considered threatening, if not an invasion. If the police insist on acting like prowlers by the unjustified invasion of private property, they expose themselves and the public to the dangers that the Fourth Amendment was created to prevent.

Law enforcement is dangerous enough when the police follow the law and conduct searches based on probable cause or with search warrants. Judges and courts should not raise the stakes by licensing the police to prowl uninvited around private property without probable cause or search warrants. Likewise, life in our society is dangerous enough for citizens. We should not have to fear invasion by the people sworn to protect and defend us from killers, thieves, and prowlers. There are already some law-abiding people in our society who view the police with distrust, if not outright hostility. The majority decision to sanction the police conduct in this case will simply strengthen those attitudes, thereby making law

enforcement even more difficult and heightening public anxiety even further.

I respectfully dissent.

Andree Layton Roaf, Judge, dissenting. I believe that the first officer's entry into the back yard constituted an illegal search under the Fourth Amendment. It is well established that the curtilage of a home is afforded the Fourth Amendment protection against unreasonable search and seizure. In *United States v. Dunn*, 480 U.S. 294 (1987), the court said that the curtilage question should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home; whether the area is included within an enclosure surrounding the home; the nature of the uses to which the area is put; and the steps taken by the resident to protect the area from observation by people passing by.

Moreover, since the entry into the backyard area was a warrantless search, it is presumptively unreasonable. *See Fultz v. State,* 333 Ark. 586, 972 S.W.2d 222 (1998); *Williams v. State,* 327 Ark. 213, 939 S.W.2d 364 (1997); *Evans v. State,* 65 Ark. App. 232, 987 S.W.2d 741 (1999). The burden is then on the State to establish an exception to the warrant requirement. Here, the record reflects that only sketchy information was presented by the State concerning the physical layout of the Millers' property. We know only that the property was unfenced, that a "dirt path" led around to the rear of the house, and there was a back porch. Although the police had photographs of the home, the State chose not to introduce them into evidence. Accordingly, I cannot find that the State even came close to meeting its burden.

While no Arkansas case squarely addresses the question of whether an unfenced back yard and/or back porch of a residence should be afforded a reasonable expectation of privacy under the Fourth Amendment, in Wayne R. LaFave, 1 *Search and Seizure,* § 2.3(f)(3rd ed. 1996), the following pertinent discussion appears:

> [W]hen the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could expect to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment. But other portions of

the lands adjoining the residence are protected, and thus if the police go upon these other portions and make observations there, *this amounts to a Fourth Amendment search, and this is so even if these other portions are themselves clearly visible from outside the curtilage.* (Emphasis added.)

Furthermore, other states have held that entry into both fenced and unfenced back yards of residences is a search. *See State v. Parker,* 399 So.2d 24 (Fla. App. 1981)(illegal search to enter fenced backyard as it was not accessible to the public and more private than the front); *Kann v. State,* 694 S.W.2d 156 (1985)(illegal search where officer went to rear of townhouse and entered curtilage to peer through hole in the fence); *Emiliano v. Texas,* 840 S.W.2d 102 (1992)(illegal search when officers walked around to the back of a residence and looked into a garage at the back of the residence).

I concede that legitimate police business may occasionally take officers to part of a person's premises not ordinarily used by visitors, without running afoul of the Fourth Amendment. *See Lafave,* § 2.3(f), *supra.* However, the activities by the police in those instances usually involve far more than a "knock and talk," in which the person called upon has no obligation to participate, or to even answer the door. *See e.g. Brenneman v. State,* 264 Ark. 460, 573 S.W.2d 47 (1978)(officer serving traffic citation went to rear of premises to see if defendant was in the yard after receiving no answer to knock at front door and seeing defendant's car parked nearby); *State v. Hider,* 649 A.2d 14 (Me. 1994)(officer tracking car thief with tracking dog entered rear of defendant's curtilage); *State v. Austin,* 332 S.E.2d 619 (W.Va. 1985)(police properly at rear of house to secure premises while others executed search warrant within). However, I am convinced that the facts in this case establish that the police conducted an illegal search. The officer entered the back yard of the residence after receiving no answer to his knock at the front door. He was fully aware that the owners were detained in Texas after their arrest and admitted that he knew that the information about the arrest in Texas did not constitute a sufficient basis to obtain a search warrant. Under these facts, the officer who later observed the marijuana from the adjacent field would not have been posted there but for the initial impermissible intrusion. All the evidence obtained was thus "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471 (1963).

Indeed, the discussion quoted quite extensively by the majority from *United States v. Doaust,* 916 F.2d 757 (1st. Cir. 1990), as supporting an affirmance of the Millers' convictions actually supports a finding of an impermissible search under the facts of this case. In *Doaust,* the court stated that a policeman may lawfully go to a person's home to interview him, and in so doing, can go up to the front door. However, the court said that "*if that door is inaccessible* there is nothing unlawful or unreasonable about going to the back of the house to look for another door, as part of a legitimate attempt to interview a person," and that the record reflected that the police went to the back "looking for an *accessible* main floor entrance" not to see if unlawful activity was taking place, but as part of their efforts to interview Doaust. (Emphasis added.)

Moreover, all but one of the remaining cases relied upon by the majority in support of an affirmance are clearly distinguishable. *U.S. v. Bradshaw,* 490 F.2d 1097 (4th Cir. 1974)(conviction reversed where federal agents received no answer to knock at appellant's front door, then decided to try the back door and looked in a truck parked near the house while en route to the back door); *U.S. v. Anderson,* 552 F.2d 1296 (8th Cir. 1977)(conviction affirmed where federal agents received no answer at appellant's front door, a light was visible inside, agents heard a dog barking at the rear, and walked around the house to see if there was someone with the barking dog); *U.S. v. Garcia,* 997 F.2d 1273 (9th Cir. 1993)(conviction affirmed where officers went to back door in a good faith belief that they were going to the front door). Only *Long v. State,* 532 S.W.2d 591 (Tex. 1975), *(rehearing denied* 1976 )(conviction affirmed where officers received no answer after knocking at both carport and back doors of house and smelled marijuana from an open window as they continued around house to leave) even arguably supports the majority's position. There is absolutely no evidence in this case to show that the Millers' front door was not the main entrance, was not fully accessible, or that the rear of the house was visible to passers-by or put to any non-private use.

I do not fault the police officer for going to the Millers' home in an attempt to investigate the tip received from the Texas police. He could have gotten lucky; someone might have been there and consented to a search. However, I believe that the officer had insufficient cause to enter the Millers' back yard on an investigatory "knock and discuss" after receiving no response to his knock at the

front door, and that none of the established exceptions to the Fourth Amendment are applicable to the facts of this case. Citizens of our state should not have to go to the expense of erecting fences, acquiring vicious guard dogs, or posting "No Trespassing" signs in order to enjoy a reasonable expectation of privacy in their back yards. The State has not met its burden of showing that this intrusion was justified, and I would reverse.

HART, GRIFFEN, and NEAL, JJ., join.